Larry Edward ALEXANDER, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 18553, 18554.

United States Court of Appeals
Eighth Circuit.

July 12, 1967.

Rehearing Denied Aug. 21, 1967.

Simon Galter, Lincoln, Neb., for appellant.

Duane L. Nelson, Asst. U. S. Atty., Omaha, Neb., for appellee; Theodore L. Richling, U. S. Atty., Omaha, Neb., on the brief.

Before MEHAFFY and GIBSON, Circuit Judges, and STEPHENSON, District Judge.

MEHAFFY, Circuit Judge.

Appellant Alexander seeks review from his convictions on two counts of an indictment charging the forging and counterfeiting of material signatures on United States money orders in violation of 18 U.S.C. § 500 and on an indictment charging that he knowingly transported a stolen automobile from Lawton, Oklahoma to Verdon, Nebraska in violation of 18 U.S.C. § 2312. The cases, based on the two separate indictments, were consolidated for trial in the United States District Court for the District of Nebraska. We affirm the convictions.

The essential facts are not in dispute and briefly summarized disclose that appellant was in the Army, stationed at Fort Sill, Oklahoma, when on August 26, 1965 he and one Dennis Burk left the Army camp without leave and proceeded to Lawton, Oklahoma where they stole a Buick convertible automobile. They drove the stolen car to Frederick, Oklahoma where appellant had formerly lived for several weeks in the home of Reverend James Royce Thomason. After an anonymous telephone call insuring the vacancy of the Thomason home, appellant entered the house, ransacking a desk drawer and stealing therefrom certain articles including the money orders involved, which were made payable to Reverend Thomason. Following this, appellant and Burk, ed in the stolen automobile to Verdon, having switched the license plate, proceed-Nebraska, Burk's home. After reaching Verdon, they drove to Lincoln, Nebraska where appellant obtained a social security card in the name of Reverend Thomason and used the card as identification to cash the stolen money orders, forging thereon Reverend Thomason's signature as endorser.

Appellant and Burk returned to Verdon after cashing the money orders in Lincoln, Nebraska. Their actions at Verdon were suspicious, causing the local law enforcement officers to check on the license plate on the Buick, finding it had been issued for another car. The sheriff, his deputy and the town marshal drove to the Burk residence to make an investigation and seeing the Buick in front of the home noticed appellant was asleep in the front seat of the car. He was awakened by the officers' tapping on the window and the sheriff conversed with him while the deputy went to the house to ascertain if anyone were there. Finding no one at the house, the deputy returned to the car and discovered that appellant was holding a pistol on the sheriff. Appellant threatened the sheriff's life if he did not have the deputy hand over his gun, whereupon the deputy, in order to prevent assassination of the sheriff, handed his gun to appellant, who then attempted to take the sheriff as a hostage. The sheriff, an elderly man who had suffered a stroke, had been sitting in the front seat of the car with his right leg outside, since because of the stroke it was difficult for him to use his leg normally. He refused to accompany appellant and proceeded to get out of the car, telling appellant that he would have to shoot him in the back if he wanted to stop him. The sheriff then walked to the deputy's car and appellant drove off in the Buick at a high rate of speed which at times approximated one hundred miles per hour, with the sheriff and the deputy in hot pursuit. During the chase, the officers alerted other law enforcement people by radio. Eventually, appellant lost control of the Buick and it overturned in a ditch, but appellant was uninjured and continued his flight on foot. A search party had formed and a helicopter located appellant in a bean field a few miles distant from the wrecked automobile where he was apprehended by two youths, escorted to the road, and turned over to the sheriff and his deputy. Appellant was promptly taken to the sheriff's office and interrogated by the county attorney after being fully advised of his constitutional rights and during which custodial investigation he admitted the commission of the crimes.

Upon his arraignment, appellant, with apparent clear knowledge of his rights,

pleaded guilty in open court. The court subsequently, however, allowed him to change his plea to one of not guilty, but when this change of plea was indicated appellant's court-appointed attorney was allowed to withdraw based on grounds that appellant failed to heed his advice. The court thereupon appointed another attorney for appellant who has ably represented him throughout the trial of several days and on this appeal.

*The Confessions.*

Appellant made three confessions, each of which was introduced in evidence, and he challenges the court's refusal to suppress this evidence. The first confession was made to the county attorney on August 31, 1965 immediately upon appellant's arrival at the courthouse. The second was made to FBI agents the following morning, and the third to a general investigator for the United States Army on that same day—September 1, 1965. None of the interrogations was for an inordinate length of time nor were they accompanied by any semblance of coercion.

Appellant did not take the stand and there is no dispute as to his guilt. The only issue before us on this evidentiary matter is whether the guidelines set forth in *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), were scrupulously adhered to by the law enforcement officers, the interrogations having been conducted prior to appointment of an attorney for appellant.

We note that the interrogations here were conducted ten months before the date on which the decision in *Miranda* was handed down which was on June 13, 1966. Nonetheless, the protection of appellant's constitutional rights was fully observed by each of the investigative agencies so as to scrupulously comply with the guidelines subsequently enunciated in *Miranda*. Immediately upon appellant's apprehension at approximately 2:00 p. m. on August 31, 1965, he was delivered into the custody of the sheriff who promptly took him to the courthouse, assuring him enroute that he had nothing to fear as he would not be mistreated. Photographers had assembled at the courthouse entrance at the time of the arrival of the sheriff and appellant, but at appellant's request they were forbidden to take pictures. Appellant was then taken into the sheriff's office where he was interrogated for the first time, said interrogation being conducted by the county attorney, Mr. Henry F. Schepman. Mr. Schepman, who had had thirteen years' experience in office, introduced himself to the appellant and a conversation followed after Mr. Schepman fully advised appellant of his constitutional rights. Mr. Schepman clearly informed appellant of his right to remain silent; that anything he said could be used against him; that he had a right to have a lawyer of his own choice, but if unable to employ one, a lawyer would be provided.[1] Mr. Schepman asked ap-

---

1. The following is an extract from the testimony of Mr. Schepman:

"Q. Do you recall at what time of day this was?

"A. As I remember it was about 15 or 20 minutes before 3, somewheres in that area, on August 31, 1965.

"Q. Now, after you and the defendant were both present in the office did you have a conversation with the defendant?

"A. I did, sir.

"Q. And at the beginning of that conversation did you make any statements to the defendant regarding his rights as an accused or arrested person?

"A. Yes; I did, but before I did that, sir, I told him—I identified myself and said, 'I am Henry F. Schepman, the county attorney of the County of Richardson, state of Nebraska, and you have a right to have a lawyer of your own choosing if you have the money. If you don't an attorney will be furnished you gratis, free by the County of Richardson, state of Nebraska. You need not make any statement, but if

pellant if he would mind relating what had happened and appellant responded in detail and later made a statement in his own handwriting.

On the following day, appellant was interrogated by an FBI agent and an Army investigator. Both of these individuals also advised appellant of his right to remain silent, that any statement he might make could be used against him, and of his right to counsel.

■ Appellant cites and relies on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but *Escobedo* is not applicable to the facts here as appellant did not request counsel and counsel was not denied him. Von Schmitt v. United States, 366 F.2d 773 (9th Cir. 1966). In the case at hand, as

in United States v. Ardner, 364 F.2d 719 (4th Cir. 1966), there is no suggestion that appellant could not have contacted anyone he desired.

In *Miranda,* the Court in discussing *Escobedo* reiterated that "the police did not effectively advise him [Escobedo] of his right to remain silent or of his right to consult with his attorney." The record here reveals a complete absence of the finding in *Miranda* of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." Miranda v. State of Arizona, supra, 384 U.S. at 445, 86 S.Ct. at 1612. Here, the record is replete with advice to appellant of his constitutional rights.[2]

you do make any statement that statement will be used in court against you.'
"Q. And did you repeat this advice as to rights more than one time?
"A. I'm sure I did.
"Q. And have you interviewed other

"A. I have been making a practice of that, sir.
"Q. Then you have interviewed other persons under arrest?
"A. Oh, yes. One year we had 52 felony cases.
"Q. And it is your practice to immediately advise as to their rights as you have just indicated?
"A. That's right.
"Q. And did you in your advice as to the rights, did you indicate to the defendant that——
"A. He could have a jury trial too.
"Q. That he could have this appointed attorney right then?
"A. Yes, sir."

2. In addition to those mentioned, appellant was advised of his rights at the hearing before the Commissioner, and the following colloquy took place between the trial judge and appellant and his attorney at his first plea of guilty:
"THE COURT: Mr. Alexander, I have some questions now I want to ask you. First of all, do you have any questions about either of these indictments that you want to ask your own attorney or Mr. Nelson, because that's the name of the Assistant United States Attorney who just read these charges, or me as the presiding judge of this court?

. "THE DEFENDANT: No.
"THE COURT: Has anyone, particularly anyone connected with the law-enforcement instrumentalities of the United States, but has anyone at all exercised any pressure, coercion upon you, made any threats against you, beating you up in any way, applied any physical punishment to you or otherwise in any way abused you that causes you to come in here at this time and want to enter a plea?
"THE DEFENDANT: No.
"THE COURT: Has anyone held out any promises to you directly or indirectly or made any representations or statements to you that cause you to come in here and want to enter a plea?
"THE DEFENDANT: No.
"THE COURT: As you stand here do you feel that you are acting freely and voluntarily?
"THE DEFENDANT: Yes.
"THE COURT: Have you had adequate opportunity to talk with your counsel about this matter?
"THE DEFENDANT: Yes. ﹡
"THE COURT: Do you think you are sufficiently informed that you know the plea you want to enter?
"THE DEFENDANT: Yes.
"THE COURT: Mr. Murphy, do you feel that Mr. Alexander does understand this matter and is ready to enter a plea?
"MR. MURPHY: Yes. We have had a good many conferences. I think it is ——it could be pointed out that he is better able to understand now than he was initially, and I think it is wise that

It is argued that appellant when interrogated was tired and unable to make an intelligent waiver. He was, of course, tired from the ordeal of his flight on foot through rough country, but his mental acuteness was not affected, and he was not tired on the following day when he was interrogated by the FBI agent and the Army representative.

Entwined in appellant's argument are references to the background life of appellant which is sad indeed. Appellant was next to the youngest of seven children. His father was a construction worker and was away from home frequently except for weekends, and finally abandoned his family when appellant was eight years of age. When he ultimately quit sending money to appellant's mother, this necessitated her moving the family to her father's farm in Iowa. From his early youth, appellant engaged in petty thefts such as stealing watermelons and a bicycle, and he and two of his older brothers were eventually committed to the Iowa State Correctional School for Boys. At this institution, however, he finished the tenth grade and did well in the subjects he liked, and excellent in some of them. His intelligence was above average with a quotient of 115. He continued to engage in petty thefts at the school and would occasionally run away. He is to be pitied because of his family background and early environment, but this neither excuses his criminal conduct nor serves to invalidate the confessions he freely, voluntarily and intelligently made. Everyone connected with appellant, from the superintendent of the Iowa juvenile home to the sheriff, his deputy, the county attorney and two trial judges, not only treated appellant with consummate compassion and consideration, but went to great lengths to assure him full protection of all his constitutional rights. The Supreme Court in *Miranda* specifically pointed out that confessions given freely and voluntarily without compelling influences are proper and that a person's constitutional rights, after proper warnings, may be knowingly and intelligently waived. Chief Justice Warren stated:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. * * *

* * * * * *

" * * * After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." 348 U.S. at 478, 479, 86 S.Ct. at 1630.

■ We are convinced by the record here that appellant was properly and fully apprised of his constitutional rights, and we are also convinced of the complete absence of any police tactics, or compulsion in any form, that would invalidate reception of the confessions in evidence.

*Insanity Issues.*

We group the remaining issues as each relates to the insanity defense and each has been considered and resolved contrary to appellant's contentions in our recent opinion in Pope v. United States, 372 F.2d 710 (8th Cir. 1967).

■■ The presence of a mental illness does not mean that an offender is not mentally competent to stand trial—and it is the function of the jury to decide the ultimate issue of insanity. Feguer v. United States, 302 F.2d 214, 236, 242 (8th

the Court took the action that it did when it did in sending him to Missouri.
"THE COURT: Do you have any feeling in your mind that maybe he shouldn't be entering a plea because——
"MR. MURPHY: No.
"THE COURT (continuing): ——of his lack of understanding or mental condition or anything like that?

"MR. MURPHY: No. I am convinced in my own mind that the report from Missouri is accurate insofar as I am able to comprehend its substance."

Cir. 1962). Both psychiatrists, Dr. Jones for appellant and Dr. Buschman for the Government, testified that appellant was without psychosis. They agreed that because of appellant's unfortunate home life, previous infractions, and apparent inability to adjust to the norms of society, he was mentally diseased and antisocial. The only material and vital area of disagreement between the psychiatrists was the mental ability of appellant to resist the impulse to commit criminal acts. The jury's determination of appellant's sanity settled this issue. This is unchallenged and we mention this evidence summarily only to illuminate the record background.

Specifically, the remaining assignments of error are (1) the trial court's order permitting a psychiatric examination of appellant; (2) failure of the trial court to instruct the jury as to whether a finding of not guilty would release a dangerous person on society or insure hospitalization until he is cured; and (3) the court's instructions on insanity.

The *Pope* case was considered by this court en banc. Judge Blackmun in writing the opinion for the court dealt with these precise issues exhaustively and in a most complete, clear and logical fashion buttressed by citation of a numerosity of supporting judicial precedents, leading to the conclusions there reached. The intensive treatment by Judge Blackmun leaves nothing of consequence to be added here except as we may particularize the events in the case at hand for a proper equation with the results reached in *Pope*.

The complaints against appellant charging the offenses were made on September 7, 1965. In cooperation with appellant's attorney, the United States on September 22, 1965 filed a motion, resulting in a court order, to commit appellant to the Medical Center for Federal Prisoners for a mental examination pursuant to 18 U.S.C. § 4244. The concern at the time stemmed from appellant's suggestion of contemplated suicide and apparent disregard for what might happen to him. The report from the Medical Center was received, finding that appellant was competent to stand trial. On February 25, 1966, appellant's attorney made application to the court for permission to employ, at Government expense, Dr. Robert K. Jones, a psychiatrist, to evaluate appellant's mental capacity. The court granted this request. On August 20, 1966, prior to commencement of the trial, appellant made an affidavit in support of a request for a subpoena for Dr. Jones, whose testimony would allegedly indicate that appellant lacked the capacity to control his behavior and to choose between alternative causes of action. Thereafter on August 23, 1966, the United States moved for an order permitting Dr. Milton Buschman of the staff of the Medical Center at Springfield, Missouri to examine appellant as to his mental condition. Dr. Buschman had previously examined appellant under his prior commitment to the Medical Center and had advised the United States Attorney that he would need one additional interview in order to testify in the case.[3] The court granted the Government's motion and Dr. Buschman was permitted to examine appellant during an evening recess of court on August 30, 1966, the trial having commenced the preceding day. Dr. Buschman's testimony was offered in rebuttal after the defense had introduced the evidence of its psychiatrist witness and lay witnesses as to appellant's mental condition. There is no suggestion that Dr. Buschman testified as to any incriminating statement by appellant.

3. The following is an extract from the Government's motion for an order permitting the examination:

"The plaintiff has been advised by defense counsel that the defendant has been examined by a psychiatrist and that insanity will be his defense. In order to meet necessities of proof, it will be necessary to have a psychiatrist qualified to testify at trial. Dr. Buschman previously examined the defendant pursuant to the Court's order of September 22, 1965, and has stated to counsel that he will need one additional interview with the defendant in order to testify regarding his mental condition at the time of the offense."

 It is argued in appellant's brief that allowance of a mental examination of an accused by the Government is in the nature of an ex cathedra or star chamber proceeding—unauthorized by any rule or statute; and that the Government could have made its defense by propounding hypothetical questions to its witness or by cross-examination of appellant's psychiatrist.

 It would violate judicial common sense to permit a defendant to invoke the defense of insanity and foreclose the Government from the benefit of a mental examination to meet this issue. Judge Holtzoff in Battle v. Cameron, 260 F. Supp. 804, 806 (D.D.C.1966), observed:

"To place the burden of proof on this issue on the Government and at the same time to deprive the Government of an opportunity for a mental examination of the defendant, would lead to an absurdity and would be a travesty on justice."

Judge Blackmun in *Pope,* supra, had this to say on the subject:

"While we have recognized that expert medical opinion may not always be an essential on the government side of a competency issue, (citations omitted) it is certainly advisable and to be encouraged as an important factor in the ascertainment of the truth. * * *

* * * * * *

"We therefore specifically hold that by raising the issue of insanity, by submitting to psychiatric and psychologic examination by his own examiners, and by presenting evidence as to mental incompetency from the lips of the defendant and those examiners, the defense raised that issue for all purposes and that the government was appropriately granted leave to have the defendant examined by experts of its choice and to present their opinions in evidence." 372 F.2d at 720, 721.

 Next appellant argues that the jury should have been admonished that appellant would have been hospitalized if acquitted. We note that appellant made no request for such an instruction, and neither did he interpose an objection to the court's charge for not including such an instruction. The asserted error is not properly preserved, but in any event we held in *Pope,* supra at 731, that absent a specific statutory provision, "a defendant's disposition is not a matter for the jury's concern."

Finally, appellant argues that instructions on insanity which admittedly were approved by this court in Feguer v. United States, supra, should be declared erroneous because there is a trend of authority to the contrary, and in the light of modern understanding of mental illness the instructions cannot be properly understood by a jury.[4] The Honorable Robert

4. The complaint of instructions follow:
"Item No. 21
"The burden cast upon the government in this case does not require that the government prove that the defendant was not mentally ill in any degree at the time of the commission of the offenses charged. It does require that the evidence adduced be sufficient to convince and satisfy you beyond a reasonable doubt that the defendant was sane and was not insane at the time of the commission of the offenses within the meaning of the test which I shall outline to you.
"Item No. 22
"The words 'criminal act' as used herein in connection with the matter of sanity shall be considered by you as including the words 'criminal acts' and 'criminal offense.'

"In order for a person to be criminally responsible for the doing of a criminal act, he must have been sane at the time he committed it. If he was not sane at the time he committed the criminal act, then under the law he is held to be not guilty by reason of insanity of any criminal charge based on such act. This is because the law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime.
"Under the law a person who commits a criminal act is sane if (a) at the time he had sufficient mental capacity and reason to distinguish right from wrong as to the particular act and if (b) he had the mental capacity and reason to understand the nature

Van Pelt, who presided over this trial, also presided in the *Pope* case, and we approved his giving of these same instructions.

and character of the act and its consequences and if (c) his doing of the act was not occasioned by an uncontrollable or irresistible impulse.

"In the present case, in order to convict the defendant of the offenses charged, the burden of proof is upon the government to establish beyond a reasonable doubt that the defendant was sane at the time he committed the offenses charged. The defendant is not called upon to prove that he was insane at that time.

"In order for the government to establish that the defendant was sane at the time he committed the offense charged in each separate count, it must establish beyond a reasonable doubt each and all of the three following propositions, to wit:

"1. That at the time of the commission of the offense charged, the defendant had the mental capacity and reason to distinguish between right and wrong as to such offense.

"2. That at the time of the commission of the offenses charged, the defendant had sufficient mental capacity and reason to understand the nature and character thereof and the consequences of such offense.

"3. That he did not commit the offenses charged by reason of uncontrollable or irresistible impulse.

"A person acts from an uncontrollable or irresistible impulse when he does an act not because of a desire and intention to commit the same but is moved to do so because of an impulse which he is not able to control or resist, or in other words, that he was unable to prevent himself from committing it.

"In reaching your verdict you will understand that the defendant's mental condition at the time of the acts charged in each case is a question of fact to be decided by you in accordance with the facts as developed from the evidence aided by whatever knowledge the psychiatric profession can supply, giving the opinions of such experts such weight as you conclude they are entitled under this charge. You must determine in your studies whether the requisite criminal intent existed at the time of the acts charged. The reason the law does not hold a person criminally accountable for his conduct while insane is because such an insane person is not capable of forming the intent essential to the commission of a crime and does not have the capacity to conform his conduct to society's standards.

"In referring to the mental capacity and reason of the defendant to distinguish between right and wrong, I charge you that you are not interested in his knowledge of moral judgments as such or the rightfulness or wrongfulness of things in general. You must make a determination as to the defendant's knowledge of wrongfulness so far as the acts charged are concerned. This could be stated as his capacity to conform his conduct to society's standards or, in more commonplace language, whether the defendant was aware when he committed the acts, that his acts were a violation of law.

"'Insane,' as used in this charge, means such a perverted and deranged condition of mental and moral faculties as to render a person either incapable of distinguishing between right and wrong, or incapable of knowing the nature of the act he is committing; or, even where a person is conscious of the nature of the act he is committing, and is able to distinguish between right and wrong, and knows that the act is wrong, yet his will—the governing power of his mind—has been so completely destroyed that his actions are not subject to it, but are beyond his control.

"It would therefore follow that you must consider and deliberate upon whether or not at the time of the acts charged in each separate case, the defendant was mentally or emotionally disordered to the extent that he did not have the mental capacity to distinguish between right and wrong, and whether or not the defendant lacked the capacity to appreciate the nature and consequences of the acts with which he is charged, and whether or not he committed the offenses charged by reason of uncontrollable or irresistible impuse, as I have explained these propositions.

"If the government has established each and all of the foregoing propositions numbered 1, 2 and 3, beyond a reasonable doubt, then it has established beyond a reasonable doubt that the defendant was sane at the time he committed the offenses charged. If the government has failed to establish beyond a reasonable doubt any or all of the foregoing propositions numbered 1, 2 and 3, then you should find the defendant not guilty by reason of insanity."

Our careful consideration of the entire record compels the conclusion that appellant was given a fair trial with all of his rights meticulously protected at every stage. The record is free of error and affords no justification for disturbance of the judgments by a reviewing court.

The judgments of conviction are affirmed.