UNITED STATES of America, Appellee,

v.

Syble REIFSTECK, Appellant.

No. 75–1704.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 15, 1976.

Decided May 7, 1976.

James F. Malone, St. Louis, Mo., for appellant.

Richard E. Coughlin, Asst. U. S. Atty., St. Louis, Mo., for appellee; Donald J. Stohr, U. S. Atty., St. Louis, Mo., on brief.

Before HEANEY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

Syble Reifsteck appeals her conviction of counterfeiting and conspiracy to counterfeit in violation of 18 U.S.C. §§ 471 and 474. We affirm.

The evidence admitted at trial showed that between January and July, 1974, defendant Reifsteck requested the assistance of several persons to print a million dollars in counterfeit money. In late May, 1974, Reifsteck met her codefendant, Harry Sims, who agreed to assist in the operation. Sims

owned a print shop and agreed to make the plates and negatives. On July 1, 1974, Sims and Reifsteck made negatives of twenty dollar bills which were subsequently used to print the counterfeit money.

On July 16, 1974, defendant met Dave Delfel, a printer, and requested his help in consummating the scheme. After this meeting, Delfel contacted the FBI and Secret Service. He agreed to play along with the scheme, and, when contacted by Mrs. Reifsteck, suggested that he bring another printer to help. Defendant agreed.

The operation was carried out on July 19 and 20, 1974. On July 19 Delfel and Special Agent Lightsey of the Secret Service met the defendant and Sims at Sims' print shop. Reifsteck gave Lightsey nine pattern notes designating different Federal Reserve Banks. Sims and Reifsteck left for a short time and returned with ink, paper and other supplies.

After defendant left the print shop, Delfel and Lightsey commenced printing the counterfeit money. The printing continued throughout the night until the press broke down. On the morning of July 20 Reifsteck called the shop. When advised that the press had broken down, she stated that the operation could be finished elsewhere. She returned to the print shop driving a rented car and the parties began to load the counterfeit money and supplies into the automobile. All of the parties were arrested at this time.

At trial, defendant did not controvert the government's evidence concerning her participation in the counterfeiting operation. She defended on the grounds of insanity at the time of the offense and entrapment. On this appeal, she claims error in the following respects: 1) the admission of certain medical evidence offered by the government to rebut the defendant's insanity evidence; and 2) refusal to allow the jury to consider the government conduct theory of entrapment.

## I.  Insanity.

Before trial, the government requested a judicial determination of defendant's mental competency to stand trial. The motion was granted and Dr. James McClure was appointed by the court to examine Mrs. Reifsteck. On November 20, 1974, a hearing was held at which Dr. McClure and Dr. Gary Kulak, defendant's personal psychiatrist, both testified that Mrs. Reifsteck was incompetent to stand trial. The basis for these opinions was that defendant was either mentally retarded or had a chronic brain illness which precluded her from functioning well intellectually.

The competency hearing was suspended by the court and Mrs. Reifsteck was committed to a federal hospital in Kentucky for further examination. The order of commitment stated that further examination should be conducted to determine the following: 1) whether Mrs. Reifsteck was competent to stand trial; and 2) whether she was competent at the time of the offense.

The competency hearing was resumed on January 31, 1975. At that time, Dr. Jimmie Hawthorne, the defendant's examining psychiatrist in Kentucky, testified that she was competent to stand trial although her intelligence was in the dull normal range. Hawthorne also testified that he found no evidence that Mrs. Reifsteck was suffering from an organic brain disease. At the conclusion of the hearing, the court found that Mrs. Reifsteck was mentally competent to stand trial.

At trial, Reifsteck offered the testimony of Drs. McClure and Kulak and her personal psychologist Leonard Saxon to support her insanity defense. All three testified that, in their medical opinions, defendant was not capable of appreciating the wrongfulness of her actions at the time of the offense. In rebuttal, the government offered the testimony of Drs. Hawthorne and Welsh. They testified that in their medical opinions Reifsteck was capable of appreciating the wrongfulness of her acts.

Defendant argues that the admission of this rebuttal evidence violated 18 U.S.C. § 4244 and her privilege against self-incrimination. We disagree.

■ We note at the outset that defense counsel did not object to the admission of the rebuttal testimony at trial. Thus we review this issue under the plain error rule. *See* Fed.R.Crim.P. 52.

Section 4244 provides a procedure by which an accused may be examined before trial to determine whether he or she is competent to stand trial. Section 4244 authorizes the court to hold a hearing on the issue if reasonable cause exists to believe that the accused is not competent to stand trial. The statute also provides:

> No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

■ The purpose of psychiatric examination under section 4244 is only to establish defendant's competency to stand trial. *United States v. Maret,* 433 F.2d 1064, 1067 (8th Cir. 1970), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1678, 29 L.Ed.2d 155 (1971). " * * * [S]ection 4244 does not authorize an order compelling a defendant to submit to a psychiatric examination to determine his sanity at the time of the offense * * *." *United States v. Malcolm,* 475 F.2d 420, 424 (9th Cir. 1973). *See also United States v. Albright,* 388 F.2d 719, 722 (4th Cir. 1968). However, the court may order such an examination within its inherent power, *id.; see also Alexander v. United States,* 380 F.2d 33, 39 (8th Cir. 1967); *United States v. Moudy,* 462 F.2d 694, 697 (5th Cir. 1972), and Fed.R.Crim.P. 12.2(c) not yet in effect at trial, now specifically permits such an examination. We are aware of no rule prohibiting an order, as was entered in this case, authorizing an examination of defendant's competency at the time of the offense contemporaneous with an examination of defendant's competency to stand trial. We perceive strong reasons for permitting such a dual examination.

> This allows economy of judicial and medical efforts, * * * and of the accused's time. In a sense, the discretion to enlarge the examination does * * * expose him to the possibility of bolstering the government's case. But, in the end, all concerned—court, counsel, and parties—have an interest in determining if the accused was incompetent at the time of the offense, * * *.

*United States v. Moudy, supra,* 462 F.2d at 697.

■ In this case, it became readily apparent that Mrs. Reifsteck would interpose a strong defense of insanity when Drs. McClure and Kulak testified at the competency hearing that she was suffering from mental retardation and (or) organic brain disease. The district court could have reasonably concluded that considerations of time and expense justified an order requiring examination of defendant's competence at the time of the offense as well as her competence to stand trial. The order was, therefore, a permissible exercise of the court's inherent power. *United States v. Mattson,* 469 F.2d 1234, 1236 (9th Cir. 1972), *cert. denied,* 410 U.S. 986, 93 S.Ct. 1513, 36 L.Ed.2d 183 (1973); *United States v. Julian,* 469 F.2d 371, 376 (10th Cir. 1972).

■ By the time Drs. Hawthorne and Welsh testified in rebuttal, defendant Reifsteck had opened up the insanity question by offering substantial evidence on the issue. The government was forced to offer medical testimony in rebuttal or suffer a directed acquittal. No evidence was adduced in rebuttal as to any statements made by Mrs. Reifsteck during the examination. Under these circumstances no basis existed for challenging the disputed testimony as an abuse of the court's inherent power. *Alexander v. United States, supra,* 380 F.2d at 39; *United States v. Malcolm, supra,* 475 F.2d at 427.

■ Defendant's argument that admission of the disputed testimony violated her privilege against self-incrimination is similarly without merit. The defendant offered substantial medical evidence that she was unable to appreciate the wrongfulness of her actions at the time of the offense. This

evidence shifted the burden of proving sanity beyond a reasonable doubt to the government.

■ If the government is required to shoulder the entire load, it should not be denied access to the only reliable source of information concerning the defendant's sanity. *United States v. Albright, supra,* 388 F.2d at 724. As Judge Mehaffy stated in *Alexander v. United States, supra,* 380 F.2d at 39:

> It would violate judicial common sense to permit a defendant to invoke the defense of insanity and foreclose the Government from the benefit of a mental examination to meet this issue.

■ Drs. Hawthorne and Welsh did not testify to any incriminating statements made by defendant during her stay in Kentucky. The testimony was limited to their clinical impressions of her mental condition at the time of the offense. Under these circumstances, defendant was not deprived of her privilege against self-incrimination.[1] *United States v. Albright, supra,* 388 F.2d at 724–725; *United States v. Malcolm, supra,* 475 F.2d at 426. We hold, therefore, that admission of the disputed testimony was not plain error.

Defendant cites *United States v. Driscoll,* 399 F.2d 135 (2d Cir. 1968), and *United States v. Alvarez,* 519 F.2d 1036 (3d Cir. 1975), to support her argument that the disputed testimony was inadmissible. Both cases are inapposite. In *Driscoll* and *Alvarez,* medical testimony was offered on the issue of defendant's sanity at the time of the offense even though the court's order had directed only an examination of defendant's competence to stand trial. In both cases, the defendant was unfairly surprised by the admission of the fruits of the examination on the issue of sanity at the time of the offense.

■ The element of surprise is missing here. In this case, defendant Reifsteck was fairly apprised of the dual purpose of the examination by the commitment order itself.[2]

## II. Entrapment.

Reifsteck next argues that she was entitled to an instruction on the government conduct theory of entrapment. Alternatively, she argues that the degree of government participation in the crime was so fundamentally unfair as to constitute entrapment as a matter of law.

■ Defendant's first argument is now foreclosed by *Hampton v. United States,* —— U.S. ——, 96 S.Ct. 1646, 48 L.Ed.2d 113, No. 74–5822 (filed April 27, 1976), *aff'g,* 507 F.2d 832 (8th Cir. 1974). In *Hampton,* the defendant requested an instruction which embodied the government conduct theory of entrapment. Five justices agreed that under *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), no such instruction was proper.[3] Thus, the mandate of *Hampton* is clear that a jury may be allowed to consider only the predisposition theory of entrapment. The standard predisposition instruction was given to the jury in this case and the issue was resolved against defendant Reifsteck.

Defendant's second argument, that the degree of government participation in the crime was so fundamentally unfair as to constitute entrapment as a matter of law, is not foreclosed by *Hampton.* A plurality of the Court, by Mr. Justice Rehnquist, did express the view that outrageous police conduct could never bar a conviction on entrapment grounds, assuming the defend-

---

1. We emphasize that admission of psychiatric testimony on the issue of sanity at the time of the offense which included statements of the accused relating to guilt would raise serious self-incrimination questions.

2. The *Driscoll* case was decided by the Second Circuit in its supervisory capacity and has been strictly limited to its facts. *United States v. Matos,* 409 F.2d 1245, 1247 & n. 2 (2d Cir.

1969), *cert. denied,* 397 U.S. 927, 90 S.Ct. 934, 25 L.Ed.2d 107 (1970).

3. The plurality opinion of Mr. Justice Rehnquist, in which Chief Justice Burger and Mr. Justice White joined, and the concurring opinion of Mr. Justice Powell, with whom Mr. Justice Blackmun joined, both express this view.

ant was predisposed to commit the crime. However, five justices agreed that a court, in its supervisory capacity or under due process principles, could conceivably bar a conviction of a predisposed defendant because of outrageous police conduct.[4]

We find that the degree of government participation in this crime was not so fundamentally unfair as to constitute entrapment as a matter of law. The entire counterfeiting operation was set up by Mrs. Reifsteck before the government entered the case on July 16, 1974. Prior to this time, the defendant had contacted several individuals to assist in the counterfeiting operation. She purchased the supplies used to print the bogus currency. At her behest, codefendant Harry Sims made negatives of twenty dollar bills before the government entered the case.

It is true that the actual printing of the bills was done by the government agents. But Mrs. Reifsteck not only acted in concert with the government agents but initiated the crime. The record indicates that the printing was done at the express direction of defendant Reifsteck and primarily for her benefit. Thus, the government conduct falls far short of violating fundamental fairness.[5] *Hampton v. United States, supra. United States v. Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643, 36 L.Ed.2d at 373; *United States v. Weber*, 518 F.2d 987, 989–990 (8th Cir. 1975); *Willis v. United States*, 530 F.2d 308 (8th Cir., filed Feb. 27, 1976).

The judgment of conviction is affirmed.

---

**4.** The dissenting opinion of Mr. Justice Brennan, with whom Mr. Justice Stewart and Mr. Justice Marshall concurred, expresses this view. The concurring opinion of Mr. Justice Powell, with whom Mr. Justice Blackmun joined, also expresses this view.

**5.** As stated by Mr. Justice Powell in *Hampton v. United States, supra*, footnote 7: "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." That level was not reached in this case.