**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry Otis CANTWELL, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Arthur HAMILTON, Defendant-Appellant.**

Nos. 84–2048, 84–2049.

United States Court of Appeals, Tenth Circuit.

Dec. 9, 1986.

Gary Hagman, Weatherford, Tex., for defendant-appellant Cantwell.

Vicki Mandell-King, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, Denver, Colo., was also on brief), for defendant-appellant Hamilton.

Robert J. Hackman, Asst. U.S. Atty. (Robert N. Miller, U.S. Atty., Denver, Colo., was also on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and DOYLE * and LOGAN, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendants Larry Otis Cantwell and James Arthur Hamilton appeal their convictions on a three count indictment for conspiracy falsely to make counterfeit federal reserve notes with intent to defraud, and to possess plates and the like for counterfeiting, in violation of 18 U.S.C. § 371, possessing and controlling counterfeiting equipment, in violation of 18 U.S.C. § 474, and falsely making and counterfeiting federal reserve notes with intent to defraud, in violation of 18 U.S.C. § 471. We affirm.

## I

### A.

Viewing the facts in the light most favorable to the convictions, as we must at this juncture, the record reveals the following:

Defendant Cantwell started an appliance store across the street from the printing equipment repair shop of Bruce Buckner in Denver, Colorado in the summer of 1983. Buckner did some printing for Cantwell's business, and through Cantwell Buckner met defendant Hamilton, who also had Buckner print some brochures and business cards for him. Buckner saw Cantwell and Hamilton several times a week in the fall of 1983 and winter of 1983–84. Buckner would occasionally have soft drinks while visiting Cantwell's store, and Cantwell sometimes borrowed tools from Buckner.

On the afternoon of March 22, 1984, Cantwell and Hamilton came into Buckner's shop, and Cantwell asked Buckner if Buckner could go across the street and talk about a printing job defendants had. When Buckner asked if he, Buckner, could "make a buck out of it," Cantwell and Hamilton chuckled and left. II R. 127.

About twenty minutes later, Buckner went over to Cantwell's appliance store, and Buckner and the defendants went into an office. Cantwell asked Buckner if he could print money. Buckner responded, "What printer can't?" Cantwell told Buckner he had worked for a counterfeit-passing ring in Denver a few years before, and Hamilton said he had sources out of state and even out of the country to "get rid of large sums of counterfeit money." Cant-

---

* The late Honorable William E. Doyle heard the argument of these appeals but did not participate in the disposition of them by this opinion.

well explained that certain times were best for passing counterfeit money at business establishments such as Wendy's or Denny's, and that Cantwell had worked with other people who printed counterfeit money but that they had had trouble with the portrait on the bill. Cantwell said that, since he needed some money and it looked as if Hamilton and Buckner each needed money, making counterfeit money "looked like a good idea." Buckner concluded the conversation by saying that he did not have all the facilities to make counterfeit money and that he would have to think about it because Hamilton and Cantwell were asking him to do something very dangerous. II R. 128–30.

Buckner went back to his shop and called the Secret Service. That night he spoke with an answering service, and he telephoned the Secret Service again about 8:30 the next morning, on March 23. Buckner reported the conversation he had had with defendants the day before to an agent, and later that morning he met with two agents and reported his conversation with Cantwell and Hamilton to them. Pursuant to an agreement he made with these two agents, Buckner permitted two other agents to install a lamp containing a transmitter in his shop. II R. 131–33.[1]

After the lamp was installed on March 23, Buckner went across the street and motioned for defendants to come over to his shop. Cantwell came into Buckner's shop, and they had a conversation near the lamp-transmitter. When Buckner said he could not afford to buy a camera for them to use, Cantwell offered ideas on how he might obtain one. Cantwell discussed the kind of paper they needed and how they might obtain it and stated that he and Hamilton wanted Buckner involved as little as possible in purchasing the "raw goods" needed to make the counterfeit money. Cantwell went on to recount his past experience with counterfeit money, saying he

"did" about $10,000 and made 20 cents on the dollar, and that he had been trained how to hide counterfeit money, how to separate it, how to put it in different places, and how to combine "good with bad." Cantwell also said that at one time he had the opportunity to buy a Chief printing press and had been trying to counterfeit for years. Cantwell explained how he and Hamilton would dispose of the counterfeit after Buckner printed it, and he remarked that Hamilton had "cooked up the idea" of printing counterfeit money. VI R. Gov't. exh. 12, at 2–29.

On March 27, 1984, Buckner again met with Cantwell and Hamilton. At this meeting Cantwell spoke of his mounting debt and said he had to "get this goddamn money done" and had to "get about, about, ah, 3 to 4 grand turned." VI R. Gov't. exh. 13, at 47. Cantwell said he needed the money to carry out a business franchise he was planning. When Buckner asked why Cantwell needed to counterfeit money if he was planning to make large profits from his franchise venture, Cantwell replied it was because "we were talking about [counterfeiting] before [the franchise] came through." Id. at 45.

During the meeting Buckner told Hamilton what materials would be needed for the counterfeiting process, and Hamilton listed them on a piece of paper. Buckner and the defendants studied samples of ink from an ink swatch book Buckner had and discussed what colors most closely matched the two shades of green found on the twenty dollar bill. Buckner and the defendants decided the defendants would buy the supplies, ink, paper and other items discussed during the meeting. Buckner did not give the defendants any money to buy supplies. III R. 4–9. When discussing how to pay for the special camera needed to do the counterfeiting, Hamilton suggested that Buckner pay by check and then stop pay-

---

1. Buckner had a series of meetings with defendants in his shop, and during all but two of the meetings Buckner wore a small tape recorder the Secret Service installed on his body. III R. 4, 14, 22, 39. After the investigation was over, Buckner received approximately $2,800 for his activities as an informant, although while the investigation was proceeding Buckner did not know whether he would be receiving any money from the Secret Service. II R. 43, 125–26.

ment on the check, but Buckner rejected the idea. VI R. Gov't. exh. 13, at 11.

Buckner again met with the defendants on March 28, 1984. Cantwell brought to the meeting two cans of green ink defendants and Buckner had discussed earlier. That day Buckner moved a paper cutter he had acquired several months earlier and was storing elsewhere into his shop. The paper cutter was suitable for cutting paper into the size of individual bills. III R. 14–16. Cantwell told Buckner that he, Cantwell, had lined up three different cameras to use in the counterfeiting process. VI R. Gov't. exh. 14, at 7. Hamilton returned to Buckner's shop with 1,200 sheets of Old Council Tree bond paper and some chemicals Buckner had told him to purchase for the counterfeiting process. III R. 16. Hamilton said he was getting "happier and happier" and "all excited" thinking about the counterfeit money they were about to make. VI R. Gov't. exh. 14, at 27, 31.

The next day, March 29, Buckner and defendants met again. Hamilton brought some additional Old Council Tree bond paper to Buckner's shop, and Hamilton and Cantwell compared the feel of a sheet of Old Council Tree to the feel of a genuine federal reserve note. III R. 33–34; IV R. Gov't exh. 15, at 2. Cantwell volunteered to go to the bank to get the bills to use as models for counterfeiting, and Hamilton said he wanted to buy some black plastic to line the windows of Buckner's shop so light would not be visible from the outside at night while they were working. Id., at 11–13. When Hamilton complained he did not have enough money for supplies, Cantwell said the "main concern" was to get the money printed as quickly as possible because they were "really runnin' short." Id., at 21–23. Buckner told defendants what photographic supplies they needed, and they agreed to meet again that day after the defendants had obtained the camera and photographic supplies. Id. at 35–44.

Later that day defendants returned and told Buckner they had the supplies and that the camera and supplies were all set up in the basement of Cantwell's store. Buckner went to Cantwell's store to inspect the camera, and although defendants thought it safer to photograph the bills in Cantwell's basement, Buckner and Cantwell moved the camera into Buckner's shop while Hamilton blocked out the windows of Buckner's shop with black plastic. Hamilton, Cantwell and Buckner then went to a nearby camera store to buy some filters for the camera. III R. 26. During the drive back from the camera store Buckner said he was getting nervous. Cantwell responded that Buckner should "just pump the shit and do the best job [he] can," and both defendants said they were excited. VI R. Gov't. exh. 15, at 96.

After returning to Buckner's shop from the camera store, Hamilton, Cantwell and Buckner used the camera and the supplies Cantwell and Hamilton had obtained to attempt to make negatives of twenty dollar bills. Buckner operated the camera; Cantwell held a red "safe light" over the developing trays; and Hamilton turned the shop's lights on and off as needed. They had difficulty creating a negative of sufficient quality to use in making the plates for the printing process because the chemicals Hamilton had purchased were not suitable, and they manufactured no counterfeit bills that night. III R. 36–37.

Buckner met the defendants the next morning, on March 30. Hamilton gave Buckner more money so Buckner could buy additional chemicals to use in developing negatives. Buckner left the defendants, met with Secret Service Agents monitoring the investigation, and went to buy photographic chemicals and a few other supplies with the money Hamilton had given him. After purchasing the supplies, Buckner went to Cantwell's store, and he and Cantwell returned to Buckner's shop. There they began to "shoot negatives" and develop them. III R. 38–43. Cantwell again assisted Buckner by holding the safe light over the developing trays. IV R. 5.

Hamilton arrived at Buckner's shop at about 1:00 p.m., and for the next six hours

Hamilton, Cantwell and Buckner manufactured the counterfeit money. Cantwell continued to hold the safe light, and Hamilton again turned the shop lights on and off as needed while Buckner was using the camera. Hamilton and Cantwell took turns holding the wet negatives in front of a small electric heater Buckner had in his shop. Hamilton helped Buckner develop the printing plates. Once the presses were running, Cantwell stood in front of the press, watched the images of twenty dollar bills coming off the press and controlled the flow of ink onto the paper. Buckner, Hamilton and Cantwell discussed and monitored the quality of the printed sheets as they were coming off the press. Hamilton was concerned that the paper was too brilliant and tried several different methods to change its color, including dunking one of the bills in a cup of dirty water and smearing yellow ink on other bills. IV R. 6–13.

At approximately 7:00 p.m. on March 30, several Secret Service Agents entered Buckner's shop with a key Buckner's wife had given them. When the agents entered the shop, Hamilton was standing by one of the two presses Buckner and the defendants were using, and he appeared to be operating it. Hamilton had green ink on his hands and shirt. Cantwell was standing near the second press. II R. 64–65, 72.

In addition to the two presses, the agents found the camera used to produce the negatives, photographic negatives, printing plates of twenty dollar bills, chemicals, and related photographic and printing supplies. They also found sheets of counterfeit twenty dollar bills. Each sheet had four bills, and the sheets were in various stages of completion. Some were printed on only one side; some sheets had both sides printed but were missing seals and serial numbers; and some sheets had both sides printed and completed seals and serial numbers. IV R. 19–22. However, none of the sheets

had been cut into individual bills. II R. 115–116.[2]

### B.

Following return of the three count indictment, Cantwell's and Hamilton's cases were consolidated for trial. The prosecution presented the testimony of the Secret Service Agents, Buckner, and Buckner's wife, and the tapes of the recorded conversations Buckner had with the defendants. Secret Service Agent James Cline said that in his opinion the images on the printing plates the agents found in Buckner's shop bore a likeness to genuine twenty dollar federal reserve notes. V R. 16–17.

After the prosecution rested, Hamilton's attorney moved for a judgment of acquittal on counts I and II without any further argument and on count III on the ground that the evidence showed none of the bills defendants had printed had been cut when they were arrested. Citing *United States v. Grismore*, 546 F.2d 844 (10th Cir.1976), he argued that uncut bills cannot be counterfeit as a matter of law so that defendants were guilty only of attempted counterfeiting, which is not a crime. He also argued that the serial numbers on the completed bills were too faint to be mistaken as authentic. Cantwell's attorney joined in the motions. The trial judge denied all three motions, preferring to submit to the jury the question whether the uncut bills were counterfeit. V R. 20–29.

Defendants relied on the entrapment defense. V R. 31. Each defendant testified on his own behalf. Cantwell testified that he opened his store in April 1983 and that Buckner first mentioned counterfeiting in November of that year. V R. 34–35. He said Buckner raised the subject again just before Christmas and in February 1984. V R. 36. During the February conversation, Cantwell said, Buckner seemed serious about counterfeiting and showed him a

---

**2.** The agents found sheets containing $1,287,840 in counterfeit bills which only contained backs. Sheets containing $6,640 in counterfeit bills had fronts and backs but no seals or serial numbers. $6,820 had complete backs but only seals and serial numbers on the front. Sheets containing $1,140 in bills had fronts, backs and completed serial numbers. The agents found $40,800 in sheets with backs in the trash. II R. 92–93.

business card with a replica of the ends of a folded twenty dollar bill on the back which Cantwell claimed Buckner represented to be an example of his work. V R. 37–39; VI R. Def. exh. 1–A. Cantwell testified that this convinced him to work with Buckner to counterfeit money but that they did not start the operation until March because Cantwell and Hamilton did not have the money to buy the necessary supplies. V R. 39–40. Cantwell said he, Hamilton and Buckner agreed that Buckner was to be "fully in charge" of the printing and that the defendants were to finance the operation and find a way of "getting rid of" the completed counterfeits. V R. 45. Cantwell also said he had no special knowledge of printing, denied any past experience with counterfeiting, and said Buckner originated the idea. V R. 46–50.

Hamilton testified that Buckner first raised the subject of counterfeiting with him in the fall or winter of 1983 and that he was present when Buckner showed Cantwell the business card with the twenty dollar replica on the back. Hamilton testified that the bill on the back of the card "looked real" to him. V R. 88–92. Hamilton testified that although he did not want to join Buckner's counterfeiting scheme he went along with it to pacify Buckner. In March he became convinced Buckner could succeed, decided to "give it a try," and became actively involved. V R. 93–95. Hamilton testified that although he originally thought he would play only a limited role Buckner got him more involved than he anticipated by asking for help in obtaining supplies and running the camera and printing presses. V R. 96. Hamilton admitted the plan was for him to pass the finished counterfeit notes. *Id.*, at 97–99.

Defendants' attorneys renewed their motions for judgment of acquittal, which the court again denied. The jury returned guilty verdicts as to each defendant on all three counts. The court sentenced Hamilton and Cantwell each to three years' imprisonment on count I. The court suspended the sentences on counts II and III and ordered defendants to serve five years' probation, to be consecutive to the sentences served under count I. These appeals followed and were consolidated.

## II

### A. Cantwell's Contentions

Cantwell asserts he is entitled to a judgment of acquittal because the evidence establishes he was entrapped as a matter of law. The Government says the cases Cantwell relies on suggest he is really raising the outrageous governmental conduct defense which, it contends, does not apply here.

■ "Entrapment *as a matter of law* exists only where there is undisputed testimony which shows conclusively and unmistakably that an otherwise innocent person was induced to commit the act complained of by the trickery, persuasion or fraud of a government agent." *United States v. Gurule*, 522 F.2d 20, 23 (10th Cir.1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976) (emphasis in the original). Cantwell and Hamilton each did testify that Buckner showed them the business card with the twenty dollar bill replica on the back, and Buckner did not testify again after the defendants' testimony to deny that he showed defendants the card and represented it was an example of his work. However, we feel ample evidence supports the jury finding that the Government did not induce Cantwell to commit the crimes of which he was convicted and that he was predisposed to commit them.[3] We feel the

---

**3.** For example, although Cantwell contends Buckner first approached him and Hamilton with the counterfeiting idea, Cantwell's Brief at 3, Buckner testified that on March 22, 1984, one day before Buckner contacted the Secret Service, Cantwell and Hamilton invited Buckner over to Cantwell's store, asked Buckner if he knew how to print money, and suggested they all might want to go into counterfeiting. II R. 127–29. Furthermore, in the taped conversations among Cantwell, Hamilton and Buckner, Cantwell stated that the counterfeiting scheme was originally Hamilton's idea, VI R. Gov't. exh. 12, at 29, and that he, Cantwell, wanted to involve as few people as possible in the operation and would have printed the money himself

trial judge acted properly when he denied Cantwell's motion for acquittal on the entrapment defense. The court correctly instructed the jury on the entrapment issue, and the jury decided this against the defendants.

■ To the extent Cantwell relies on the outrageous governmental conduct defense, that defense "is manifestly reserved for only 'the most intolerable government conduct.'" *United States v. Warren,* 747 F.2d 1339, 1341 (10th Cir.1984), *quoting United States v. Jannotti,* 673 F.2d 578, 608 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). We have also said a defendant may not invoke the Due Process Clause "unless the government's acts, no matter how outrageous, had a role in inducing the defendant to become involved in the crime." *United States v. Gamble,* 737 F.2d 853, 858 (10th Cir.1984). The governmental conduct here is not of the extent required for a due process violation.[4]

### B. Hamilton's Contentions

■ Hamilton argues that the trial court erred in submitting the charge of falsely making and counterfeiting federal reserve notes to the jury. He says uncut sheets containing multiple false impressions of United States currency cannot be counterfeit within the meaning of 18 U.S.C. § 471, the statute under which he and Cantwell were convicted.

Hamilton relies on *United States v. Grismore,* 546 F.2d 844 (10th Cir.1976). There, the defendant was convicted for violating 18 U.S.C. § 472, uttering and possessing counterfeit obligations of the United States. The evidence showed that Grismore received counterfeit currency in a paper bag as payment for medallions he sold. After separating the counterfeit bills from a small amount of genuine currency, Grismore used a counterfeit bill to purchase a pair of socks. When Grismore was arrested, he had counterfeit bills in his possession, and a search of his rental car uncovered $5,690 in counterfeit notes and "sixteen pages each of 50 and 100 dollar counterfeit federal reserve notes, each page containing four fully printed notes ..." *Id.,* at 846.

The judge instructed the jury that uncut bills could not be considered counterfeit. *Id.* at 849. Grismore argued on appeal that this instruction created the impermissible inference that the cut bills were counterfeit. We disagreed, stating:

> Here, part of the evidence established the existence of possibly counterfeit notes and other evidence established that some of the notes were not counterfeit. Under these circumstances the instructions given by the court were entirely proper. *Id.*

Hamilton argues that since none of the bills in this case were actually cut *Grismore* compels his acquittal as a matter of law because he did not successfully complete the offense of counterfeiting, and there is no offense of an attempt to counterfeit. The Government responds that *Grismore* does not stand for the proposition defendant states. It argues that the uncut state of the bills was only one factor for the jury to consider in deciding whether

---

if he could print. *Id.,* at 43. When Buckner said he was getting nervous, Cantwell and Hamilton encouraged Buckner to continue in the enterprise and said they were "excited" about making counterfeit money. VI R. Gov't. exh. 15, at 96. Cantwell responded affirmatively when Buckner asked whether the scheme was "all you guy's whole idea." VI R. Gov't. exh. 16 at 51–52.

**4.** We are satisfied that the evidence, such as was outlined in note 3, *supra,* in no way demonstrates a due process violation, which is a determination for the court to make. *United States v. Szycher,* 585 F.2d 443, 445 (10th Cir.1978).

*See also United States v. Belzer,* 743 F.2d 1213, 1218 (7th Cir.1984), *cert. denied sub nom. Clements v. United States,* 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985) (Government provided supplies and expertise for counterfeiting operation); *United States v. Gonzales,* 539 F.2d 1238, 1239–40 (9th Cir.1976) (Agents purchased press, ink and supplies, and participated in operating cameras and running printing presses); *United States v. Reifsteck,* 535 F.2d 1030, 1034–1035 (8th Cir.1976) (Government informant operated printing press in defendants' absence).

they were counterfeit and that the trial court acted properly when it submitted the question whether in fact the bills were counterfeit to the jury.

"The manifest purpose of the counterfeiting statute is the protection of all currency and obligations of the United States." *United States v. LeMon*, 622 F.2d 1022, 1024 (10th Cir.1980). As the trial court instructed in this case:

> An item is 'counterfeit' if it bears such a likeness or resemblance to a genuine obligation or security issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be honest and upright. ·

I R. 89. *See also, United States v. Parnell*, 581 F.2d 1374, 1381 (10th Cir.1978), *cert. denied sub nom. Cox v. United States*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979); *Grismore*, 546 F.2d at 849.[5]

Although a literal reading of *Grismore's* language lends credence to defendant's argument that uncut sheets can never be considered counterfeit, a closer reading shows the case does not stand for that proposition. In that case, we said the instructions were "entirely proper" because some evidence established that some notes were possibly counterfeit while other evidence established that "some of the notes were not counterfeit." *Id.* In so saying, we were dealing solely with the argument of the defendant there that the instruction that the uncut sheets there were not counterfeit created the impermissible inference that cut sheets of bills necessarily are counterfeit. *See United States v. Brunson*, 657 F.2d 110, 113 (7th Cir.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982).[6]

Here, the judge acted properly when he submitted to the jury the question of whether the uncut sheets involved in this case were counterfeit. Admittedly, some of the bills in this case were too incomplete to be considered counterfeit. However,

---

**5.** In *Grismore,* we determined that this standard was the proper one to apply in cases involving the uttering or possession of counterfeit obligations under 18 U.S.C. § 472. *See also United States v. Drumwright,* 534 F.2d 1383, 1385 (10th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 385, 50 L.Ed.2d 327 (1976) (defining a counterfeit obligation within the meaning of § 472 as one "of such character that under favorable circumstances it could be uttered and accepted as genuine"); *First National Bank & Trust Co. of Oklahoma v. United States Fidelity & Guaranty Co.,* 347 F.2d 945, 947 (10th Cir.1965) ("the term 'counterfeit' means an imitation of an authentic document or writing or a resemblance intended to deceive and to be taken for the original").

This standard was originally articulated under the predecessor of 18 U.S.C. § 474, to make it clear that the statute "extended to illicit obligations that would be unlikely to fool a cautious man or an expert but that might deceive an ordinary person in the normal course of commerce." *United States v. Turner,* 586 F.2d 395, 398 n. 7 (5th Cir.1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979). *See also Regan v. Time, Inc.,* 468 U.S. 641, 643–44 & 644 n. 1, 104 S.Ct. 3262, 3264–65 & 3264 n. 1, 82 L.Ed.2d 487 (1984); *United States v. Raynor,* 302 U.S. 540, 543–546, 58 S.Ct. 353, 356, 82 L.Ed. 413, *reh. denied,* 303 U.S. 665, 58 S.Ct. 520, 82 L.Ed. 1123 (1938) (both recounting the legislative history of § 474 and its predecessors); *Unit-*

ed States v. Lustig, 159 F.2d 798, 802 (3d Cir. 1947), *rev'd. on other grounds,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949) (applying the standard to a § 474 case); *United States v. Weber,* 210 F. 973, 976 (W.D.Wash.1913) (applying the standard under § 474's predecessor).

Although many cases have used similar language to describe the degree of similitude necessary to render a likeness counterfeit under 18 U.S.C. §§ 471, 472 and 474, they usually have pointed out that § 474 is "less stringent," *United States v. Chodor,* 479 F.2d 661, 664 n. 3 (1st Cir.), *cert. denied,* 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973), and "is intended to cover a much broader range of counterfeiting and enterprises than the predecessor statutes of sections 471 and 472." *United States v. Johnson,* 434 F.2d 827, 830 (9th Cir.1970). *See also United States v. Smith,* 318 F.2d 94, 95 (4th Cir. 1963).

**6.** We are authorized by the full court to clarify the *Grismore* opinion so that it not be read to hold that *uncut* but completely printed sheets of counterfeit obligations cannot be considered as counterfeit. All we actually decided in *Grismore* was that the jury instruction about the uncut sheets was not in error for the reason the defendant claimed, *i.e.,* that the instruction said "the cut sheets were conclusively counterfeit." 546 F.2d at 849. There was no such implication in the *Grismore* charge in those circumstances.

$1,140 in sheets had only to be cut into individual bills to be complete. Although still uncut, these counterfeit bills were "sufficiently complete to be an imitation of and to resemble the genuine article," *United States v. Johnson*, 434 F.2d 827, 830 (9th Cir.1970), and, as to them, "[t]he jury was warranted in finding ... that a snip with a pair of shears was too inconsequential a matter to consider significant." *United States v. Moran*, 470 F.2d 742, 743 (1st Cir.1972) (per curiam) (interpreting 18 U.S.C. § 472). The convictions under § 471 for falsely making and counterfeiting federal reserve notes are amply supported by the evidence.

AFFIRMED.