UNITED STATES of America,
Plaintiff,

v.

Angela JOHNSON, Defendant.

No. CR 01–3046–MWB.

United States District Court,
N.D. Iowa,
Central Division.

March 17, 2005.

Charles J. Williams, Patrick J. Reinert, U.S. Attorney's Office Northern District of Iowa, Cedar Rapids, IA, Thomas Henry Miller, Aag Hoover State Office, Des Moines, IA, for Plaintiff.

Alfred E. Willett, Terpstra, Epping & Willett, Cedar Rapids, IA, Dean A. Stowers, Rosenberg, Stowers & Morse, Des Moines, IA, Patrick J. Berrigan, Watson & Dameron, LLP, Kansas City, MO, Robert R. Rigg, Drake University Legal Clinic, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S ASSERTION OF FIFTH AMENDMENT RIGHT AGAINST SELF–INCRIMINATION DURING MENTAL EXAMINATIONS

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1148
   A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1148
   B. The Present Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1149
II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1151
   A. This Court's Prior Ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1151
   B. Pertinent Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1152
      1. Federal decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1152
         a. An Eighth Circuit decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1152
         b. Other federal decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1153
      2. State court decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1154
         a. Oklahoma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1154
         b. Oregon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1156
         c. New Jersey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1157
         d. California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1158
   C. The Appropriate Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1159
      1. The competing interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1160
      2. Sufficiency of Rule 12.2 procedures . . . . . . . . . . . . . . . . . . . . . . . . 1161
      3. Appropriate supplementation of Rule 12.2 . . . . . . . . . . . . . . . . . . . 1162
   D. Application Of The Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1164
   E. Access To Raw Testing Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1165
III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1167

Can a capital defendant, who has indicated an intention to rely on mental condition evidence during the "penalty phase" of her trial, if any, "plead the Fifth" to questions about her involvement in the charged murders during mental examinations by government mental health experts? That question arose in this case after the court ordered mental examinations of the defendant by government experts pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. Because the trial date in this case is fast approaching, the question requires expedited resolution.

## I. INTRODUCTION

### A. Background

Defendant Angela Johnson is facing trial beginning in April 2005 on ten capital charges arising from her alleged involvement in the murders in 1993 of five witnesses to the drug-trafficking activities of Johnson's sometime boyfriend, Dustin Honken. The alleged murder victims are Gregory Nicholson, Lori Duncan (Nicholson's friend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10, respectively), and Terry DeGeus. The capital charges are five counts of killing witnesses while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2; and five counts of killing the same witnesses in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

More specifically, Counts 1 through 5 of the Second Superseding Indictment in this case charge that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while engaging in an offense punishable under 21 U.S.C. § 841(b)(1)(A) and 846, relating to a conspiracy to manufacture and distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine between 1992 and 2000, Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts 6 through 10 of the Second Superseding Indictment charge that, on or about July 25, 1993, or in the case of Terry DeGeus, on or about November 5, 1993, while working in furtherance of a continuing criminal enterprise between 1992 and 2000 in violation of 21 U.S.C. § 848(c), Angela Johnson intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively, and that such killings resulted, all in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. On November 14, 2002, the government filed a notice of intent to seek the death penalty on all ten of these charges. Trial is set to begin in this case on April 12, 2005.

On December 20, 2004, Johnson's counsel provided the lead prosecutor with a handwritten notice pursuant to Rule 12.2(b) of the Federal Rules of Criminal Procedure stating Johnson's intention to rely on the evidence of mental health experts during the "penalty phase," if any, of her trial. Subsequently, on January 3, 2005, Johnson filed a Defense Designation Of Expert Witnesses (docket no. 265) providing notice that four mental health experts are expected to testify on her behalf in the "penalty phase" of her trial on issues regarding her mental health.

On January 6, 2005, in response to Johnson's notice, the government filed a Motion For A Court Ordered Mental Examination Of Defendant, And Related Matters (docket no. 270). By order dated February 18, 2005, the court, *inter alia*, granted the government's motion by ordering and directing Johnson to submit to mental examinations, evaluations, or interviews by government mental health experts pursuant to Rule 12.2(c)(1)(B), subject to certain conditions and procedures. *See United States v. Johnson*, 362 F.Supp.2d 1043 (N.D.Iowa 2005). By separate order also dated February 18, 2005 (docket no. 328), the court appointed Matt Whitworth and Roseann Ketchmark, both Assistant United States Attorneys for the Western District of Missouri, as "outside taint attorneys" to manage the government's mental health experts in this case.

### B. The Present Controversy

This matter comes before the court pursuant to Johnson's counsel's oral notice to the "outside taint attorneys" of her intent to assert her Fifth Amendment right against self-incrimination during mental examinations by government experts. More specifically, according to an e-mail to a member of the undersigned's staff, dated March 4, 2005, from "outside taint attorney" Matt Whitworth, defense attorney Pat Berrigan told Mr. Whitworth that Angela Johnson "would plead the 5th Amendment if the government experts attempted to ask questions of her concerning her involvement in the murders of these five individuals." Mr. Whitworth, Ms. Ketchmark, and Mr. Berrigan requested a conference with the court concerning this matter. That conference was held on Monday, March 7, 2005.

At the conference, Johnson argued that there is a tremendous difference between reliance on mental condition evidence during the "merits phase" of the trial versus reliance on such evidence during the "pen-

alty phase," such that a defendant has a viable Fifth Amendment right against self-incrimination during examinations by government experts concerning a mental condition that would be asserted only as a mitigating factor in the "penalty phase." She explained that, in her view, if she never puts her mental condition at the time of the offense at issue during the "merits phase," she has not waived her right against self-incrimination for purposes of a mental condition mitigating factor during the "penalty phase," at least where that mitigating factor is not "offense specific." Johnson represented that she has instructed her mental health experts not to question her regarding her alleged commission of the murders or her mental state at the time of the murders. Instead, she represented that her mental health evidence, during the "penalty phase," would relate to her past and more particularly her present mental condition as a mitigating factor for punishment purposes. She also represented that she would not argue for mitigation on the basis of any offense-specific mental condition. Johnson argued that, if her experts will not get into questions related to her involvement in the charged offenses, then the government should not be able to, either. She also asserted that Rule 12.2 cannot be read as a complete waiver of a defendant's right against self-incrimination consistent with the Fifth Amendment, although she acknowledged that it might be permissible for the government to impeach her experts with why they did not ask her about her mental health at the time of the offense.

In his e-mail, the government's taint attorney asserted that a refusal by Johnson to answer questions would be contrary to the court's February 18, 2005, ruling on the government's motion for court-ordered mental examinations. *See United States v. Johnson*, 362 F.Supp.2d 1043, 1087–91 (N.D.Iowa 2005). He asserted, further,

that "[i]f Ms. Johnson is not going to discuss her involvement in this crime with our experts then there is no need to have a firewall in place." At the conference, the government's taint attorney argued that the nature of Johnson's mental health mitigating factor might be a culpability issue that would only make sense if Johnson is asked by the mental health experts about offense-specific details and her responses are presented to the jury during the "penalty phase." Moreover, the taint attorneys argued that, pursuant to Rule 12.2, none of the information provided by Johnson during mental examinations by the government's experts would ever go to the prosecutors in her case unless Johnson puts her state of mind at issue during sentencing. The taint attorney suggested that the court might receive an *ex parte* clarification of Johnson's mental health mitigating factors to assist the court in determining the need for offense-specific questions in mental health examinations.

After the taint attorneys were excused from the conference, Johnson's counsel did make a brief and general *ex parte* statement to the court concerning Johnson's mental health mitigating factors. Johnson again suggested that nothing about those mitigating factors will require offense-specific questions from mental health experts.

At the end of the conference, the court gave the parties until March 14, 2005, to provide the court with "letter briefs" concerning any issues raised during the conference. The outside taint attorneys submitted such a letter brief on March 14, 2005. In their letter brief, which was unusually well researched and argued, the taint attorneys argue that Rule 12.2(c)(4)(B) strongly implies that a capital defendant waives her Fifth Amendment right against self-incrimination by putting her mental condition at issue in the "penalty phase" of the trial. Although the taint attorneys concede that the waiver is not

"limitless," they argue that Rule 12.2(c)(4)(B) so clearly precludes use of any offense-specific statements of the defendant in the present or any future proceedings except to rebut her evidence of her mental condition that Johnson's fears of a violation of her right against self-incrimination are unfounded.

The taint attorneys also assert that all of the federal cases that they have found addressing the issue speak in terms of a complete waiver of the Fifth Amendment right when the defendant puts her mental condition at issue. The taint attorneys acknowledge that state cases from California suggest that the defendant has waived her Fifth Amendment right only to the extent necessary to permit a proper examination of the mental condition asserted, but they contend that these cases provide Johnson with no comfort, because Johnson's mental state at the time of the offenses is or may be relevant if even one juror is persuaded that her mental state was a mitigating factor.

The taint attorneys reiterate that they do not know the precise nature of Johnson's supposed mental health mitigating factors, but that Johnson should not be able to inject her mental condition into the penalty proceedings unless the government has the opportunity to rebut that mental condition evidence with crucial evidence that her mental condition did not affect her thinking or behavior at the time of the killings. The taint attorneys suggested that a stipulation concerning Johnson's use of mental condition evidence might go a long way toward dissipating their concerns, but that even with a stipulation, it might be necessary for the court to give an instruction to the jury explaining that Johnson's mental condition is not being used to show impaired capacity, substantial duress, severe mental or emotional disturbance, or any other enumerated miti-

gating factors under 21 U.S.C. § 848(m), but only for purposes of the "catchall" mitigating factor in § 848(m)(10). Finally, as an aside, the taint attorneys seek a ruling requiring Johnson's mental health experts to turn over their "raw testing data" to the government's experts, so that the government's experts can, *inter alia*, assess whether the defense experts' tests were conducted in accordance with established standards.

Johnson's defense team apparently decided to forego the opportunity to file a letter brief to articulate further her position on the issues now before the court, because the court received no timely letter brief on these issues from the defense team.

## II. LEGAL ANALYSIS

### A. This Court's Prior Ruling

The government's taint attorneys rely, in the first instance, on the court's February 18, 2005, ruling as foreclosing Johnson's contention that she can assert her Fifth Amendment right against self-incrimination during examinations by government mental health experts. *See United ed States v. Johnson,* 362 F.Supp.2d 1043 (N.D.Iowa 2005). Therefore, the court must first examine the impact of that ruling on the present controversy.

In the pertinent portion of that ruling, this court first noted that, "in *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court explained that '[t]he Fifth Amendment privilege [against self-incrimination] is directly involved [where] the State use[s] as evidence against the [defendant] *the substance of his disclosures* during [a] pretrial psychiatric examination.'" *Johnson,* at 1085 (quoting *Smith,* 451 U.S. at 464–65, 101 S.Ct. 1866, with emphasis added). However, this court also noted that, in *Powell v. Texas,* 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (*per cu-*

*riam* ), the Supreme Court had observed that its decisions in *Smith* and *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), "provide 'some support' for the conclusion that a defendant waives his or her Fifth Amendment right against self-incrimination when the defendant puts his or her mental condition at issue." *Id.* at 1085–86 (citing *Powell,* 492 U.S. at 684, 109 S.Ct. 3146); *see also Penry v. Johnson,* 532 U.S. 782, 794, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (recognizing that *Smith* is distinguishable, and hence, there may be no Fifth Amendment violation, where the defendant "himself made his mental status a central issue in ... his trial[ ] for ... murder," and has thereby placed his mental condition "at issue," but noting that "[w]e need not and do not decide whether these differences affect the merits of [a defendant's] Fifth Amendment claim," because the issue in that *habeas* action was whether a state court's decision was contrary to or an unreasonable application of the Court's precedent).

The theme of the pertinent portion of the February 18, 2005, ruling was that Rule 12.2 of the Federal Rules of Criminal Procedure adequately protects a capital defendant's Fifth Amendment right against self-incrimination, at least where the defendant has given notice of intent to use mental condition evidence only during the "penalty phase," because Rule 12.2 carefully regulates the "disclosure" and "use" of the defendant's statements during a mental examination by government experts. Specifically, as to "disclosure," Rule 12.2(c) prohibits any disclosure to prosecutors of any statements of the defendant during a mental examination by government experts until two things happen: (1) the defendant is convicted; and (2) the defendant confirms her intent to rely on mental condition evidence during the penalty phase. *See* FED.R.CRIM.P. 12.2(c)(2). Moreover, as to "use," Rule

12.2(c)(4) provides that "[n]o statement made by a defendant in the course of any examination conducted under [Rule 12.2] (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant *in any criminal proceeding* except on an issue regarding mental condition on which the defendant ... has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2)." *Id.* at (c)(4) (emphasis added). Although this court recognized that a defendant's waiver of Fifth Amendment rights, by putting her mental condition at issue, is not "limitless," *see Gibbs v. Frank,* 387 F.3d 268, 274 (3d Cir.2004), this court found that the residual protection required for Johnson's rights in this case is provided, in the first instance, by Rule 12.2(c)(4), and in the second instance, by requiring the audiotaping of all testing and interviews of Johnson by government experts and the same-day or next-day provision of those recordings to defense counsel. *See Johnson,* 362 F.Supp.2d at 1087–91; *accord United States v. Sampson,* 335 F.Supp.2d 166, 247–48 (D.Mass.2004) (requiring audiotape recording, upon agreement of the parties, to protect the defendant's Fifth Amendment right).

▇ The court now reiterates its conclusion in the February 18, 2005, ruling that, at least as a general rule, the "disclosure" and "use" limitations of Rule 12.2 bar a federal capital defendant from raising her right against self-incrimination during a Rule 12.2 mental health examination by a government expert, where the defendant has given notice of intent to use mental condition evidence during the "penalty phase." This is so, because the Rule does not permit disclosure to or use by the prosecutors of the defendant's statements during mental examinations until she is convicted and confirms her intent to rely on mental condition evidence during the "penalty phase," and the Rule does not permit use of the defendant's statements in any *other* criminal proceedings except on an issue regarding mental condition on which the defendant has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2)—in other words, the statements can only be used *in rebuttal. Accord Gibbs,* 387 F.3d at 274 (the waiver of the defendant's Fifth Amendment right against self-incrimination by putting his or her mental condition at issues is not limitless, because it only allows the prosecution to use its own mental examinations to rebut the defendant's mental condition evidence).

The question that remains, however, is whether any "hair-splitting" is possible, permitting the defendant to assert her right against self-incrimination *as to questions concerning details of, or her involvement in, the offenses charged,* notwithstanding a general waiver by putting her mental condition at issue.

### B. Pertinent Decisions

Remarkably few courts, state or federal, appear to have addressed the question of whether a defendant can refuse to answer questions concerning details of, or involvement in, charged offenses during a mental examination by the prosecution's experts. The court will survey such cases as it has marshaled on that question.

### 1. Federal decisions

### a. An Eighth Circuit decision

Nearly thirty years ago, the Eighth Circuit Court of Appeals opined in *dicta* in *United States v. Reifsteck,* 535 F.2d 1030 (8th Cir.1976), that "admission of psychiatric testimony on the issue of sanity at the time of the offense which included statements of the accused *related to guilt* would raise serious self-incrimination questions."

*Reifsteck,* 535 F.2d at 1034 n. 1 (emphasis added). However, in *Reifsteck,* the court pointed out that Rule 12.2 was not yet in effect at the time of the defendant's trial. *See id.* at 1033. Moreover, the case involved use of psychiatric evidence on an insanity defense, which is not at issue here. *Id.* Thus, this decision is not controlling in the present circumstances, where Rule 12.2 provides at least some protection for the defendant's Fifth Amendment right against self-incrimination.

The decision is nevertheless interesting. The court held in *Reifsteck* that there had been no plain error in admission of the psychiatric evidence at issue for two reasons. First, the government's psychiatrists "did not testify as to any incriminating statements made by defendant during her stay in Kentucky"; rather, "[t]he testimony was limited to their clinical impressions of her mental condition at the time of the offense." *Id.* at 1034. The court concluded that, "[u]nder these circumstances, defendant was not deprived of her privilege against self incrimination." *Id.* Second, the court concluded that there was no "element of surprise" about the use of the experts' testimony, because the defendant had been apprised of the dual purpose of the examination to respond to questions about both her competence to stand trial and her insanity defense. *Id.*

Thus, *Reifsteck* reasonably stands for the proposition that testimony by mental health experts about statements of the accused relating to the charged offense *could* raise self-incrimination questions, but that no such Fifth Amendment issue arises *where the experts do not actually testify about such statements,* and the defendant receives adequate notice of the use to which the examinations may be put. The *Reifsteck* decision does not, however, answer the question of whether the government's experts can even *ask* the defendant questions about the charged offenses and whether the defendant can be compelled to answer such questions.

### b. *Other federal decisions*

As the taint attorneys point out, federal decisions addressing the scope and extent of a defendant's waiver of Fifth Amendment protection by putting her mental condition at issue suggest that the waiver is complete and comprehensive. *See, e.g., Gibbs v. Frank,* 387 F.3d 268, 274 (3d Cir.2004) ("[T]the Fifth but not Sixth–Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings (*Buchanan, Powell* )."); *United States v. Curtis,* 328 F.3d 141, 145 (4th Cir.2003) (noting that it had previously held in *Savino v. Murray,* 82 F.3d 593, 604 (4th Cir.1996), that " '[i]n essence, the defendant waives his right to remain silent ... by indicating that he intends to introduce psychiatric testimony,' " that the "defendant has no Fifth Amendment protection against the introduction of mental health evidence in rebuttal," and that Rule 12.2(c) permits the government to introduce expert testimony if the defendant has raised the issue of his mental condition); *United States v. Sampson,* 335 F.Supp.2d 166, 247 (D.Mass.2004) ("The defendant could not present expert testimony on his mental condition and yet refuse, on Fifth Amendment grounds, to answer questions put to him by the government's experts."); *United States v. Taylor,* 320 F.Supp.2d 790, 793 (N.D.Ind.2004) (the defendant's Fifth and Sixth Amendment rights "are not infringed by this Court's Order directing him to submit to a mental health exam conducted by the Government's mental health expert since he has indicated that he intends to introduce mental health evidence during the penalty phase," and the court's order "provides safeguards to en-

sure that [the defendant's] statements cannot be used against him at [a] sentencing hearing unless and until he actually introduces mental health evidence in mitigation of the death penalty at that phase of the proceedings."); *United States v. Beckford*, 962 F.Supp. 748, 763 (E.D.Va.1997) ("[I]f a defendant elects, with the advice of counsel, to put his mental status into issue in the penalty phase, then he has waived his right to refrain from self-incrimination, and there is no Fifth or Sixth Amendment concern."); *United States v. Vest*, 905 F.Supp. 651, 653 (W.D.Mo.1995) ("If a defendant elects, with advice from counsel, to put his mental status into issue in the penalty phase, then he has waived his right to refrain from self-incrimination arising from mental health examination, and there is no Fifth Amendment implication."). However, the court has found no federal cases providing more specific guidance on the issue of whether the government's experts can ask the defendant questions about the charged offenses, whether the defendant can be compelled to answer such questions, and whether the defendant's answers—or refusals to answer—can be used against her to rebut her evidence in support of a mental health mitigating factor during the "penalty phase."

### 2. State court decisions

Lacking specific guidance on these issues from federal cases, the court has looked to state cases. State cases, unfortunately, provide no consistent answer to the question of whether the government's mental health experts can ask, and the defendant can be compelled to answer, questions about the charged offense.

### a. Oklahoma

The Oklahoma Court of Criminal Appeals has directly addressed the question of whether a defendant has a Fifth Amendment right to refuse to answer questions about details of the charged offenses. In *Traywicks v. Oklahoma*, 927 P.2d 1062 (Okla.Crim.App.1996), the court considered whether the trial court had improperly admitted evidence of a defendant's refusal to answer questions about the details of the charged crime after the defendant asserted an insanity defense. The court concluded, first, that "it is clear that when a defendant raises an insanity defense and is required to submit to a mental health examination by the State's expert, the State may introduce the results of the examination to rebut the defendant's insanity defense." *Traywicks*, 927 P.2d at 1065. "However," the court continued, "it does not appear that the State's expert is granted *carte blanche* in examining the defendant." *Id.* The court explained that, in its view, "while the defendant may be compelled to answer questions about his mental health, a constitutional violation may occur if the defendant is compelled to reveal details of the crime itself to the State's mental health expert." *Id.* The court opined that "[t]his distinction makes sense," for the following reasons:

> The State needs the mental health evidence to rebut the insanity defense, and it seems logical that raising that defense waives the defendant's right to silence as to those mental health issues. *However, evidence of the crime itself is a distinct and different question from the issue of mental illness. Accordingly, the defendant retains the right to assert his Fifth Amendment privilege as to the details of the crime.* Of course, the defendant could waive his privilege to remain silent as to the details of the crime, but that waiver would have to be done knowingly and voluntarily after the administration of *Miranda* warnings.

*Traywicks*, 927 P.2d at 1065 (emphasis added). The court did not, however, elaborate on how or why "evidence of the

crime itself is a distinct and different question from the issue of mental illness."

The court's ultimate holding in *Traywicks* was as follows:

> In Traywicks' case, the State revealed that during the examination by the State's psychiatrist, Traywicks refused to answer questions about Washington's murder. It would seem that since Traywicks could not be compelled to discuss the murder with Dr. Call without being advised of his rights and waiving those rights, it would be error for the State to comment on or elicit evidence about his assertion of that right. The trial court erred when it allowed the State to question Traywicks about his refusal to answer this question. Similarly, the State should not have questioned Dr. Call about Traywicks' refusal to answer such questions.

*Id.* Thus, the error ultimately found by the court in *Traywicks* was use of evidence of *the defendant's refusal to answer questions* where he had not been advised about his rights against self-incrimination and had not waived those rights. *Id.* (finding that the error was harmless, where the jury accepted the defendant's version of events and only convicted him of the lesser offense of second-degree murder).

Subsequently, in *Lewis v. Oklahoma*, 970 P.2d 1158 (Okla.Crim.App.1998), the court read *Traywicks* to hold that "when a defendant raises an insanity defense he waives his Fifth Amendment right to silence regarding mental health issues but he does not waive his right to remain silent regarding the details of the crime." *Lewis*, 970 P.2d at 1171 (citing *Traywicks*, 927 P.2d at 1065). However, in *Lewis*, the court found that the state's mental health expert had *not* questioned the defendant about the details of the alleged crime. *Id.* Somewhat more specifically, the court found that the expert testified that the defendant had "told him about his use of cocaine, [which was] relevant to the doctor's evaluation of [the defendant's] mental state," but such evidence "was not a detail of the crime itself." *Id.* Under these circumstances, the court found no violation of the defendant's Fifth Amendment right against self-incrimination. *Id.*

The decisions in *Traywicks* and *Lewis* suggest caution in allowing a defendant to be questioned about the circumstances of the charged offense. Indeed, both strongly support the conclusion that there is no Fifth Amendment violation if the state's expert either never asks about or never testifies about the defendant's statements concerning details of the charged crime. *Accord Reifsteck*, 535 F.2d at 1033–34 (no Fifth Amendment self-incrimination issue arises where experts do not actually testify about a defendant's statements about the crime); *see also State v. Bush*, 191 W.Va. 8, 442 S.E.2d 437 (1994) (embracing similar principles to hold that there was no violation of the defendant's right against self-incrimination where neither of the government's experts "mentioned anything about the actual murders, what led up to the murders, or any of the defendant's statements regarding the murders," and instead testified only about the defendant's mental state and drug use). Therefore, "the Oklahoma rule" suggested by *Traywicks* and *Lewis* is that government experts are barred from asking the defendant about details of the crime, or if such questions are asked and answered, the government's experts should be precluded from testifying about the defendant's statements regarding details of the crimes.

*Traywicks* and *Lewis* both involved insanity defenses, which may or may not be similar to Johnson's assertion of a mental health mitigating factor in the "penalty phase" of her case. Also, neither Oklahoma case addresses the sufficiency of Rule 12.2 or something like it to protect

Fifth Amendment interests when the defendant asserts mental health mitigating factors only in the "penalty phase."

### b. Oregon

Long before *Traywicks* established "the Oklahoma rule," the Oregon Supreme Court was "squarely presented" with the following question, which seems to be the question precisely at issue here, as well: "Does the court have the authority to require that the defendant, at a pretrial mental examination, answer questions concerning his conduct relating to the offense charged, and can the court order defendant's counsel not to advise his client to refuse to answer questions upon the ground that they might incriminate him?" *Shepard v. Bowe,* 250 Or. 288, 442 P.2d 238, 239 (1968) (*en banc*). The court noted that "[i]t is apparent that the defendant's answers to the psychiatrist's questions might be incriminating upon any of the issues in the trial, including the issue whether the defendant committed the act charged." *Id.* The court also noted that "[o]ther jurisdictions have solved the problem in varying ways." *Id.* (citing cases).

In *Shepard,* the court concluded that "[a] majority of the courts which have squarely considered the problem . . . have held that the defendant upon a pretrial mental examination cannot be required to answer questions." *Id.* (citing cases on both sides of the issue). After its survey of cases, the court stated what the undersigned will describe as "the Oregon rule":

> [T]he only way in which the constitutional right of the defendant not to be compelled to testify against himself can be adequately preserved is to hold that the defendant cannot be required to answer the questions [concerning his conduct relating to the charged offense], and the restrictions placed upon defense counsel by the trial court's order [which barred counsel from advising the defendant not to answer questions about the details of the crime] must be removed.

*Id.* at 240.

The court in *Shepard* rejected the suggestion that a defendant's right against self-incrimination could be adequately protected by instructing the jury that it could not consider *on the question of guilt* any incriminating statements that the defendant may have made to the psychiatrist, *see id.* at 241, a conclusion with which this court readily agrees. The court in *Shepard* went much further, however, by also concluding that, even if it prohibited the psychiatrist from testifying to incriminating statements made to him by the defendant in a pretrial mental examination, "requiring the defendant to *answer* could nevertheless jeopardize the privilege against self-incrimination." *Id.* This was so, the court reasoned, because "[t]he statements made by the defendant to the psychiatrist could provide a lead to other evidence which would incriminate the defendant on the issue of guilt." *Id.* Even if the trial court ordered that statements made by the defendant to the psychiatrist could not be revealed to the state or to any other person except upon court order, the court was still of the opinion that, "under certain circumstances there is more than a remote chance that such statements would become known to others in addition to the trial court." *Id.* The court did not, however, elaborate on what it thought those "certain circumstances" might be. Finally, the court recognized that its holding might lessen the quality of the evidence available to the government, and that "[p]sychiatrists have expressed the opinion that it is difficult, at least in some cases, to arrive at a competent opinion on the mental state of the defendant if the defendant cannot be questioned about the alleged crime." *Id.* Nevertheless, the court concluded that "this is a price that

must be paid to enforce the constitutional protection." *Id.*

Thus, "the Oregon rule" stated in *Shepard* is the "brightest line" rejection of questions by government mental health experts to defendants concerning details of charged crimes. Among other things, *Shepard* also seems to reject the very premise of Rule 12.2, which is that a defendant's Fifth Amendment right against self-incrimination during mental examinations is adequately protected where the defendant's statements during mental examinations cannot be disclosed to the government until the defendant waives her right against self-incrimination by confirming an intention to use mental condition evidence at the "penalty phase." Instead, the court in *Shepard* found that, even with a prohibition on disclosure to prosecutors of statements made by the defendant to mental health experts except upon court order, there was "more than a remote chance that such statements would become known to others in addition to the trial court." *Id.*

### c. New Jersey

A very different perspective is presented by some older decisions of the New Jersey Supreme Court, which carefully considered the mental health experts' *need* for the defendant's statements about the crime charged to formulate an opinion about the defendant's mental state. In *State v. Obstein,* 52 N.J. 516, 247 A.2d 5 (1968), *overruled on other grounds by State v. Williams,* 93 N.J. 39, 459 A.2d 641 (1983), the New Jersey Supreme Court reiterated its prior holding in *State v. Whitlow,* 45 N.J. 3, 210 A.2d 763 (1965), as follows:

> [W]here the defense of insanity is interposed and the State's psychiatrist finds discussion with defendant of the criminal event necessary to the formulation of an opinion on his mental capacity at the time of the homicide, defendant must cooperate fully in that regard (unless, of course, he is unable to do so because of a mental condition). His statements about the crime are admissible at the trial only on the issue of insanity, not on the issue of guilt. Therefore, they do not violate his Fifth Amendment rights. And we said that when such testimony is offered, the jury must be instructed about its limited probative force immediately and again in the court's charge, and that it cannot and must not be considered by them on the subject of guilt. *State v. Whitlow,* 45 N.J. at 16–21, 210 A.2d 763.

*Obstein,* 247 A.2d at 11. In *Obstein,* the court went beyond its prior holding in *Whitlow* to consider various circumstances in which the issue of the defendant's refusal to answer questions concerning the details of the charged crime might arise. First, the court held that, "[i]f a defendant stands mute at the examination [by government experts] or cooperates except for a refusal to discuss the alleged criminal event, at the trial his own psychiatrists will not be permitted over the State's objection to testify to the history of the event given to them." *Id.* at 12. "Further if, as is generally the case, defendant's psychiatrists required the history in order to form an opinion as to insanity, they would be precluded from testifying to that opinion." *Id.*

Of perhaps greater interest here are the observations of the New Jersey Supreme Court regarding a defendant's refusal to answer questions regarding the charged crimes when, as in Johnson's case, the defendant offers mental condition evidence for something short of an insanity defense. These observations merit quotation in their entirety:

> If an accused intends to offer [* *13] psychiatric evidence at the trial for the purpose of showing a mental disability

short of insanity which prevented or made unlikely premeditation or deliberation at the time of the homicide, is the scope of the State's psychiatrists' examination any more limited than where the defense is insanity? Undoubtedly the examiners for both defense and State would require the defendant to discuss the criminal event with them. It seems highly unlikely that they could form an opinion on the issues of premeditation and deliberation unless defendant discussed his knowledge or recollection of the homicide with them. Under the circumstances, there is no sound reason why the rule should be any different from that applicable where the defense is insanity.

*Finally, if after examination by doctors of his own selection, defendant intends to offer under State v. Mount, supra, background proof, including psychiatric proof of mental weakness or instability short of insanity, for consideration by the jury on the issue of punishment, is the State's right to examination more circumscribed than in the two situations already mentioned? The solution here must be left largely to the trial court's discretion.* It is not so likely that either defense or prosecution psychiatrists will require discussion of the homicide with the accused in order to express an opinion on his general mental condition. If, however, the defense psychiatrists obtained such information from him, in fairness and justice the State should be permitted to cover the subject also. Under our practice defendant's proof in this area will come into the trial after the State has completed its main case. If his psychiatrists testify about their discussion of the homicide with him, there is no sound reason why the State's doctors may not do likewise. If defendant refused to discuss the homicide with the State's doctors when they examined him, the trial court in its discretion may recess the trial to permit such further examination as the State, after consulting its psychiatrists, asserts is necessary to meet the position of the defense. This type of problem, *i.e.*, possible interruption of the trial, can be avoided, however, if there is fair and sensible communication between defense counsel and the prosecutor. To illustrate, in cases where the defense of insanity has not been interposed and consequently the State has had no psychiatric examinations, if the defendant, as the result of such examinations of his own, decides to introduce mental condition testimony bearing upon degree of murder or under the *Mount* doctrine, the prosecutor should be given notice in advance of trial so that he may seek similar examinations.

*Obstein*, 247 A.2d at 12–13 (emphasis added). The latter of these circumstances— *i.e.*, "background proof" of a "mental weakness or instability short of insanity, for consideration by the jury on the issue of punishment"—is most nearly the situation presented in Johnson's case.

Thus, "the New Jersey rule" is that the experts' need for the defendant's statements about the charged crimes to formulate their opinions determines whether or not the government's experts may ask, and the defendant must answer, questions about the defendant's involvement in the charged crime. A corollary of this rule is the issue of "fairness": The defendant cannot use expert testimony about the defendant's statements concerning the charged crimes if the government's experts are not also allowed to elicit such statements from the defendant for purposes of rebuttal.

#### d. California

The taint attorneys point to cases from California suggesting a rule similar to "the

New Jersey rule," explained above. Specifically, the California Court of Appeal for the Second District recently reiterated what this court will call "the California rule," as follows: "A defendant, who tenders his mental condition as an issue, waives his or her Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel *to the extent necessary to permit a proper examination of that condition.*" *Centeno v. Superior Court,* 117 Cal.App.4th 30, 40, 11 Cal. Rptr.3d 533, 540 (2004) (citing *People v. Carpenter,* 15 Cal.4th 312, 412, 63 Cal. Rptr.2d 1, 935 P.2d 708 (1997)) (emphasis added). The court explained that "[a]ny other result would 'give an unfair tactical advantage to defendants.'" *Id.* (quoting *People v. McPeters,* 2 Cal.4th 1148, 1190, 9 Cal.Rptr.2d 834, 832 P.2d 146 (1992)).

However, the impact of this "California rule" on the ability of prosecution experts to ask offense-specific questions is unclear. In *Centeno,* the court concluded that the trial court had properly interpreted the extent of the defendant's waiver where the defendant asserted mental retardation as a mitigating factor, where the trial court prohibited the prosecution's expert from questioning the defendant about the facts of the case, even though the defendant had "statutory immunity" to the use of such evidence during the guilt phase. *See id.* at 43, 11 Cal.Rptr.3d at 543 (citing CAL.PENAL CODE § 1376 as providing "a rule of statutory immunity at the guilt phase"). As to the precise scope of questioning to address the defendant's asserted mental retardation mitigating factor, the court held that examinations "are permissible only to the extent they are reasonably related to the determination of the existence of the mental condition," because "[o]therwise, there is a danger that defendants will be improperly subjected to mental examinations beyond the scope of the precise issue they have tendered and their resulting waiver of constitutional rights." *Id.* at 45, 11

Cal.Rptr.3d at 544–45. Thus, it appears that, in the view of the California Court of Criminal Appeals, offense-specific questions were outside the scope of the waiver from assertion of mental retardation. Similarly, in the seminal case of *People v. Carpenter,* 15 Cal.4th 312, 63 Cal.Rptr.2d 1, 935 P.2d 708 (1997), the California Supreme Court held that the trial court properly ordered a mental examination by the prosecution's expert, after the defendant put his mental condition at issue, by asserting diminished capacity, including presenting some expert evidence of how his mental state related to the crimes, with the limitation that the prosecution's expert "ask defendant no questions regarding the [charged] crimes." *Carpenter,* 15 Cal.4th at 412, 63 Cal.Rptr.2d at 61, 935 P.2d 708; *see also id.* at 414, 63 Cal.Rptr.2d at 36, 935 P.2d 708 (noting "the immense amount of evidence about defendant's mental state and attitude around the times of the crimes," including "substantial expert evidence on defendant's mental state and how it related to the crimes, some based on examinations of the defendant" during the sentencing phase). Thus, it is not clear from these or other California cases under what circumstances questions about the defendant's conduct during or in relation to the charged offenses would be "necessary to permit a proper examination of [the defendant's asserted mental] condition." *Centeno,* 117 Cal.App.4th at 40, 11 Cal.Rptr.3d at 540.

## C. The Appropriate Standards

Presented with varying standards, the court must make a choice. To make that choice, the court must determine whether the procedures established by Rule 12.2, either alone or with supplemental protections suggested by the cases discussed above, provide the appropriate balance between the competing interests of the defendant and the government with regard

to questioning of the defendant during mental health examinations about her involvement in charged crimes.

### 1. The competing interests

Courts have plainly recognized the defendant's interest in maintaining the privilege against self-incrimination in mental examinations by government experts. *See, e.g., Smith,* 451 U.S. at 464–65, 101 S.Ct. 1866 ("The Fifth Amendment privilege [against self-incrimination] is directly involved [where] the State use[s] as evidence against the [defendant] *the substance of his disclosures* during [a] pretrial psychiatric examination."); *Reifsteck,* 535 F.2d at 1034 n. 1 ("[A]dmission of psychiatric testimony on the issue of sanity at the time of the offense which included statements of the accused *related to guilt* would raise serious self-incrimination questions.") (emphasis added). Furthermore, as explained in more detail above, some courts have held that the defendant's interest is implicated by offense-specific questions, even where the defendant has put her mental condition at issue. *See Traywicks,* 927 P.2d at 1065 ("Oklahoma rule" case); *Lewis,* 970 P.2d 1158 (same); *Shepard,* 442 P.2d at 239–41 ("Oregon rule" case). Although there is also plainly authority that a defendant waives the privilege, *see, e.g., Powell,* 492 U.S. at 684, 109 S.Ct. 3146 (the decisions in *Smith* and *Buchanan* provide "some support" for the conclusion that a defendant waives his or her Fifth Amendment right against self-incrimination when the defendant puts her mental condition at issue); *Gibbs,* 387 F.3d at 274; *Curtis,* 328 F.3d at 145; *Sampson,* 335 F.Supp.2d at 247; *Taylor,* 320 F.Supp.2d at 793; *Beckford,* 962 F.Supp. at 763; *Vest,* 905 F.Supp. at 653, the waiver is not "limitless." *Gibbs,* 387 F.3d at 274. Instead, the waiver is only to the extent necessary to allow the government the opportunity for adequate rebuttal. *Id.; see also Sampson,* 335 F.Supp.2d at 243 (noting that the over-

all purpose of Rule 12.2 is to provide the government with an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony).

Thus, balanced against the defendant's interest against self-incrimination is the government's interest in preparation of adequate rebuttal for a mental condition defense, or in this case, a mental condition mitigating factor in the "penalty phase." *Powell,* 492 U.S. at 684, 109 S.Ct. 3146 ("In *Smith* we observed that '[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case.' ") (quoting *Smith,* 451 U.S. at 465, 101 S.Ct. 1866); *Sampson,* 335 F.Supp.2d at 243 (Rule 12.2 is intended to provide the government with adequate information to rebut a defendant's mental condition evidence); FED.R.CRIM.P. 12.2(b), Advisory Committee Comments, 1983 Amendments (without adequate notice of a defendant's intent to rely on mental condition evidence, "the government would not have had an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony on the defendant's claim [of a mental condition]"); *see also Gibbs,* 387 F.3d at 274 (the waiver of the defendant's Fifth Amendment right against self-incrimination by putting his or her mental condition at issue is not "limitless," because it only allows the prosecution to use the information obtained in its own mental examinations to rebut the defendant's mental condition evidence).

Therefore, the appropriate rule must balance these competing interests of the defendant's right against self-incrimination and the government's interest in the defendant's statements about the charged crimes where necessary to mount an adequate rebuttal.

## 2. Sufficiency of Rule 12.2 procedures

Rule 12.2 goes a considerable way toward providing the necessary balance; indeed, in most cases, its provisions are probably sufficient to protect whatever remains of a capital defendant's Fifth Amendment right against self-incrimination once the defendant puts her mental condition at issue in the "penalty phase." As the court explained in its February 18, 2005, ruling, and reiterated above, the "disclosure" provisions of Rule 12.2(c)(2) do not allow the prosecution access to any self-incriminating statements the defendant may make in a mental examination by a government expert until and unless the defendant is convicted and confirms her intent to rely on mental condition evidence during the sentencing phase, *see* FED. R.CRIM.P. 12.2(c)(2), while the "use" provisions prohibit the prosecution from using any self-incriminating statements that the defendant may make in such an examination in *any* criminal proceeding until the defendant *actually* puts her mental condition at issue in associated sentencing proceedings. *See Johnson*, at 1087–91.

These provisions of Rule 12.2 likely strike the appropriate balance when, for example, a defendant charged under 21 U.S.C. § 848 relies on *an enumerated statutory mental condition mitigating factor*, such as 21 U.S.C. § 848(m)(1) (lack of capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law), (2) (duress), or (7) (commission of the offense under severe mental or emotional disturbance). When the defendant relies on these enumerated mitigating factors, it appears that no meaningful evaluation of the defendant's mental condition can be made *except in relation to the defendant's thinking or conduct at the time of the offense.* The "lack of capacity" and "severe mental or emotional disturbance" mitigating factors under § 848(m) ex-

pressly tie the defendant's mental condition to her actions at the time of the offense. *See* 21 U.S.C. § 848(m)(1) (the mitigating factor is defined in terms of "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's *conduct* or to conform *conduct* to the requirements of the law") & (7) ("The defendant *committed the offense* under severe mental or emotional disturbance.") (emphasis added). The implication from statutory language that the defendant's *conduct* at the time of the offense was the result of the "unusual and substantial duress" is also very strong for the "duress" mitigating factor in § 848(m)(2), so that the tie between the defendant's mental condition and her actions at the time of the offense is just as apparent for this enumerated mitigating factor. Where the defendant relies on one of these enumerated mitigating factors, this court does not see how a meaningful rebuttal can be achieved without the opportunity for the government's experts to ask offense-specific questions; hence, the defendant's waiver of the Fifth Amendment right against self-incrimination necessarily includes a waiver of the right to refuse to answer offense-specific questions. *See, e.g., Obstein*, 247 A.2d at 11 (finding that a defense of "insanity" cannot be asserted or rebutted without consideration of "the history of the event," and finding that "a mental disability short of insanity which prevented or made unlikely premeditation or deliberation at the time of the homicide" required offense-specific questioning by both the defendant's and the government's experts).

■ Rule 12.2 procedures fit well with an enumerated, offense-specific mental condition mitigating factor, but the fit is less good where, as here, the defendant relies on a mental condition mitigating factor that only falls within the scope of a § 848(m)(10) "catchall" mitigating factor.

*See* 21 U.S.C. § 848(m)(10) (the defendant may also assert "[t]hat other factors in the defendant's background or character mitigate against imposition of the death sentence"). Such a mental condition mitigating factor may not be offense-specific in any sense. For example, such a mitigating factor may involve a *post-offense mental condition,* which plainly has no connection to the defendant's thinking or conduct at the time of the offense, or a *long-standing mental condition,* which may have no specific impact on the thinking or conduct of the defendant at the time of the offense. *See Obstein,* 247 A.2d at 13 (where the defendant asserts a mental condition mitigating factor based on "background proof" of "mental weakness or instability short of insanity" for consideration in the penalty phase, the defense and prosecution experts may or may not require offense-specific details to render an opinion on the defendant's "general mental condition"). In such circumstances, allowing the government's experts to ask offense-specific questions of the defendant may well exceed the scope of any examination necessary to determine the validity of the mental condition mitigating factor; thus, at least arguably, such questions would exceed the scope of the defendant's "limited" waiver of her Fifth Amendment right against self-incrimination, because they would exceed the scope of what is necessary for the government's experts to rebut the defendant's mental condition evidence. *See, e.g., Powell,* 492 U.S. at 684, 109 S.Ct. 3146 (recognizing that the defendant's silence may deprive the prosecution of necessary information to rebut an insanity defense); *Sampson,* 335 F.Supp.2d at 243 (Rule 12.2 is intended to provide the government with adequate information to rebut a defendant's mental condition evidence); FED. R.CRIM.P. 12.2(b), Advisory Committee Comments, 1983 Amendments (without adequate notice of a defendant's intent to rely on mental condition evidence, "the government would not have had an opportunity to conduct the kind of investigation needed to acquire rebuttal testimony on the defendant's claim [of a mental condition]"); *see also Gibbs,* 387 F.3d at 274 (the defendant waives her right against self-incrimination to the extent that the prosecution can use information obtained in its own mental examinations to rebut the defendant's mental condition evidence).

### 3. *Appropriate supplementation of Rule 12.2*

The court concludes that, even where the protections of Rule 12.2 are available, as they are in this case, something like "the New Jersey rule" may be necessary to provide appropriate additional safeguards by balancing the competing interests of the defendant's right against self-incrimination and the government's interest in the defendant's statements about the charged crimes. Such a rule, again, would require the court to determine the *need* that defense or government experts have for offense-specific questions, before the government's experts are allowed to ask offense-specific questions, the defendant is required to answer such questions, or the prosecution is allowed to use the defendant's responses to rebut her mental condition mitigating factor at the "penalty phase." Such judicial determinations of the government's experts' need for offense-specific detail mean that the defendant does not get to "open the door" to mental health evidence, then try to control, perhaps unfairly, what the government can use to rebut that evidence. "The New Jersey rule" also uses an appropriate "carrot and stick" approach, in that the defendant only gets to use mental condition evidence to the extent that the government has access to the same information to mount a rebuttal. *See Obstein,* 247 A.2d at 11–13 (considering both the need for offense-specific information and the fairness of

making the same information available to both the defense and prosecution).

At least in the circumstances of this case, the "no waiver" interpretation of the Oklahoma and Oregon "rules" regarding offense-specific information is as poor a fit with reality as the "comprehensive waiver" interpretation that appears to be contemplated by Rule 12.2 and such cases as *Powell*, 492 U.S. at 684, 109 S.Ct. 3146; *Curtis*, 328 F.3d at 145; *Sampson*, 335 F.Supp.2d at 247; *Taylor*, 320 F.Supp.2d at 793; *Beckford*, 962 F.Supp. at 763; and *Vest*, 905 F.Supp. at 653. This court has considerable doubt about the validity of the general proposition supporting "the Oklahoma rule," which is that "evidence of the crime itself is a distinct and different question from the issue of mental illness" when *insanity* is the issue, *see Traywicks*, 927 P.2d at 1065 (exemplifying "the Oklahoma rule"), because there would certainly be circumstances in which discussion with the defendant of the criminal event would be "necessary to the formulation" of any expert's opinion about the defendant's sanity. *See Obstein*, 247 A.2d at 11 (exemplifying "the New Jersey rule"). The court is no more convinced by that proposition when some mental condition short of insanity is asserted as a mitigating factor, because if the defense mental health experts obtained offense-specific information in support of such a mitigating factor, or the government shows that there is no credible support for application of the mitigating factor to the defendant in the absence of offense-specific questions, then "in fairness and justice the [prosecution] should be permitted to cover the subject also." *Id.* at 13. If the defendant discussed offense-specific information with her own experts, and her experts present such evidence, but she refuses to discuss such information with the prosecution's experts, the defendant should either be compelled to answer the prosecution's experts' questions or her mental condition defense,

if not stricken in its entirety, should be impeached with her failure to answer the government's experts' questions. *Id.; cf. Powell*, 492 U.S. at 684, 109 S.Ct. 3146 ("In *Smith* we observed that '[w]hen a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he has interjected into the case.' ") (quoting *Smith*, 451 U.S. at 465, 101 S.Ct. 1866).

This court finds that "the Oregon rule" is equally unsatisfactory, because it simply fails to recognize that there are *any* circumstances in which the government's experts should be permitted to ask and testify about offense-specific matters, where limitations on "disclosure" and "use" like those imposed by Rule 12.2(c) are in place. *Contra Shepard*, 442 P.2d at 241 (exemplifying "the Oregon rule"). This court also finds unpersuasive the position of the Oregon court that courts should bar all offense-specific questions by government experts on the basis of a grim, but vague, assertion that there is some "remote chance" of an improper disclosure, where that position is not supported by any anecdotal or empirical evidence, and where, as here, disclosures are strictly limited by Rule 12.2(c). *Contra id.*

One consideration that may weigh against adoption of something like "the New Jersey rule" is that the rule requires the court to make determinations about how necessary the defendant's statements about charged crimes might be to a proper formulation of expert opinions on the defendant's mental condition. Case management in capital cases is difficult enough, without such added burdens. However, the court finds that shouldering this additional burden is preferable to abdication to one of the patently inadequate "bright line" rules described above.

One modification or variation of "the New Jersey rule" seems to this court to be required where, as here, Rule 12.2 is applicable. While "the New Jersey rule" appears to place on the government the burden of showing that offense-specific details are required to the formulation of a proper opinion regarding the defendant's mental condition, *see Obstein,* 247 A.2d at 13, the "disclosure" limitations in Rule 12.2 place the government at a serious disadvantage in making such a showing until the parties are in the midst of trial. This is so, because the government is not entitled to notice of the specific nature of the mental condition mitigating factor on which a defendant intends to rely until the defendant is convicted and reiterates her intention to rely on mental condition evidence. *See* Fed.R.Crim.P. 12.2(c)(2) (timing of the government's disclosure of results and reports of its experts) & (3) (timing of the defendant's disclosure of results and reports of its experts).

■ Thus, to facilitate sentencing proceedings without unnecessary delay, *cf. id.,* Advisory Committee Comments, 2002 Amendments (subsection (b) adopts the view that "the better practice is to require pretrial notice of th[e] intent [to offer expert evidence on the defendant's mental condition] so that any mental examinations can be conducted without unnecessarily delaying capital sentencing proceedings"), as well as to afford the government adequate opportunity to rebut any mental condition mitigating factor, *see, e.g., Gibbs,* 387 F.3d at 274 (the defendant's waiver of Fifth Amendment rights is only to the extent necessary to afford the government the chance to prepare an adequate rebuttal), this court concludes that the initial burden should be *on the defendant* to show that offense-specific details are *not* necessary to the government's preparation of an adequate rebuttal of any mental condition mitigating factor. Such a showing, however, could, and under most circumstances

should, be made *ex parte* and *in camera,* at least prior to the disclosures required by Rule 12.2(c)(2) and (3), to protect the defendant's Fifth Amendment rights and to preserve the scheme to protect those rights established by Rule 12.2. The government should also have the opportunity after the Rule 12.2(c)(2) and (3) disclosures are made or during trial, to assert and demonstrate that the mental condition mitigating factor actually asserted by the defendant cannot be evaluated or supported effectively without offense-specific questioning.

### D. Application Of The Standards

■ In the present case, Johnson represented to the court and to the taint attorneys, during the conference on March 7, 2005, that she has instructed her mental health experts not to question her regarding her alleged commission of the murders or her mental state at the time of the murders. Instead, she has represented that her mental health evidence, which will be offered only during the "penalty phase," will relate to her past and more particularly her present mental condition as mitigating factors for punishment purposes. She also represented that she does *not* intend to rely on either "duress" or "lack of capacity." She represented to the court *ex parte,* after the taint attorneys were excused at their suggestion from the March 7, 2005, conference, that nothing about the mental condition mitigating factors that she intends to assert will require offense-specific questions from mental health experts. Finally, she represented both before and during the *ex parte* portions of the conference that she would not argue for mitigation on the basis of any offense-specific mental condition.

■ Under these circumstances, the court finds that there is, at least initially, no need for either the defense's or the

government's mental health experts to inquire into offense-specific details during mental health examinations of Johnson, and no need for the court to compel Johnson to answer such questions, because Johnson has made an initial showing that neither "need" nor "fairness" requires such inquiries by either party. *Cf. Obstein,* 247 A.2d at 11–13. Indeed, based on her representations, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the "penalty phase," if any, of these proceedings. Nevertheless, the government is not foreclosed from asserting—for example, after the Rule 12.2(c)(2) and (3) disclosures are made or if, contrary to her present representations, Johnson presents or one of her experts inadvertently refers to mental condition evidence specifically related to her involvement in the crimes at issue here—that its experts need to ask and obtain answers to offense-specific questions, or that Johnson's experts should have asked such questions, to formulate opinions regarding any mental health mitigating factor that Johnson actually asserts.[1]

█ The parties may also contemplate entering into a stipulation as to the reasons that no offense-specific questioning is required and why no evidence of such questioning will be presented during the "penalty phase," if any. Such a stipulation would likely dissipate the government's concerns about the need for offense-specific questions and obviate the need for further management of expert examinations by the court. Such a stipulation could be read by either party at pertinent points in the proceedings, incorporated into the "penalty phase" jury instructions, or both.

Such a stipulation would not, of course, prevent the court from determining that the government's experts *are* entitled to ask offense-specific questions in order to rebut the mental condition mitigating factor evidence *actually presented* by Johnson at the "penalty phase," if any.

### E. Access To Raw Testing Data

Finally, the taint attorneys seek a ruling requiring Johnson's mental health experts to turn over their "raw testing data" to the government's experts, so that the government's experts can, *inter alia,* assess whether the defense experts' tests were conducted in accordance with established standards. The court notes that Rule 12.2(c) provides for disclosure of the "results and reports" of the parties' mental health experts, as follows:

(2) **Disclosing Results and Reports of Capital Sentencing Examination.** The results and reports of any examination conducted solely under Rule 12.2(c)(1) after notice under Rule 12.2(b)(2) must be sealed and must not be disclosed to any attorney for the government or the defendant unless the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition.

(3) **Disclosing Results and Reports of the Defendant's Expert Examination.** After disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination, the defendant must disclose to the government the results and reports of any examination on mental condition conducted by

---

1. Johnson's counsel expressly conceded during the March 7, 2005, conference that the government might be entitled to impeach her experts with why they did not ask her about her mental state at the time of the offenses, if the government makes some showing that such questions are relevant to a proper evaluation of her mental condition mitigating factor.

the defendant's expert about which the defendant intends to introduce expert evidence. FED.R.CRIM.P. 12.2(c)(3). Read literally, no attorney for the government or the defendant could obtain the "results and reports" of the government's experts until after the defendant is convicted and confirms her intent to offer mental condition evidence in the "penalty phase." FED. R.CRIM.P. 12.2(c)(2). Similarly, read literally, Rule 12.2(c)(3) would bar disclosure "to the government" of "the results and reports" of the defendant's experts' examinations until "[a]fter disclosure under Rule 12.2(c)(2) of the results and reports of the government's examination." FED. R.CRIM.P. 12.2(c)(3). Because the court finds that "raw testing data" is plainly "results" of the defendant's experts' examinations, the court finds that, read literally, Rule 12.2(c)(3) would bar access by the government to such data until after the government makes its own disclosures pursuant to Rule 12.2(c)(2).

■■■ However, in its February 18, 2005, ruling, the court read "any attorney for the government" within the meaning of Rule 12.2(c)(2) in the context of the whole rule to mean "any attorney prosecuting the case." *See Johnson,* 362 F.Supp.2d at 1083–84 (quoting FED.R.CRIM.P. 12.2(c)(2)). Thus, the court concluded that Rule 12.2(c)(2) would permit an attorney *not on the prosecution team* to manage the government's mental health experts and their interactions with the defendant. *Id.* Similarly, the court now concludes that the limitation in Rule 12.2(c)(3) on disclosure of the "results and reports" of the defendant's experts "to the government," in the context of the whole rule, reasonably means only a limitation on disclosure "to

the prosecution." This reading of the disclosure provisions of Rule 12.2(c) preserves the sense of the rule while permitting the practical management of mental health experts, the results of their examinations, and their reports to avoid unnecessary delay in trials involving mental condition evidence in the penalty phase. For example, were the court to construe the rule otherwise, there would be little point in having a taint team to manage the government's mental health experts, because no attorney for the government, whether taint attorney or prosecutor, would have access to information necessary for the government's experts to perform their evaluations until after the defendant is convicted. On the other hand, the present interpretation avoids premature disclosure of the "results and reports" of mental health experts to the prosecution team while permitting the parties to prepare experts for the "penalty phase." Therefore, under this court's construction, there is no bar under Rule 12.2(c)(3) to disclosure *at this time* of the "raw testing data" obtained by Johnson's mental health experts *to the taint attorneys* for review by the government's experts. Johnson will be compelled to produce to the outside taint attorneys the "raw testing data" obtained by her mental health experts.[2]

■■■ On the other hand, Johnson is not entitled at this time to reciprocal access to the "raw testing data" of the government's experts. Although the court construes "any attorney for the government" within the meaning of Rule 12.2(c)(2) to mean "any attorney prosecuting the case," there is no reasonable construction of "any attorney for . . . the defendant" within the meaning of Rule 12.2(c)(2) that permits

---

**2.** The court notes that this reasoning would also permit the government's taint attorneys and the government's mental health experts to have access to the defendant's experts' reports, as well as their "raw testing data." However, the taint attorneys seek only the defendant's experts' "raw testing data" at this time.

disclosure to Johnson's defense team of the "results and reports" of the government's experts before "the defendant is found guilty of one or more capital crimes and the defendant confirms an intent to offer during sentencing proceedings expert evidence on mental condition." FED. R.CRIM.P. 12.2(c)(2). Thus, Rule 12.2(c)(2) does bar Johnson's access at this time to the "raw testing data" of the government's experts.

Moreover, there are legitimate reasons why the government's taint attorneys and the government's experts should have access to the defense experts' "raw testing data" before trial, but the defendant should not have reciprocal access to the government's experts' "raw testing data" until she is convicted and confirms her intent to rely on mental condition evidence during the "penalty phase." Specifically, the defendant already has access to her own experts' "raw testing data" and is entitled to immediate access to her own experts' reports. It is also up to the defendant whether or not she will *actually* inject the issue of her mental condition into the "penalty phase." Thus, the defendant is not "in the dark" about the mental condition that she intends to put at issue or the basis for asserting such a mental condition. In contrast, the prosecution team is only entitled to access to its own experts' results and reports if the defendant is convicted and confirms her intent to rely on mental condition evidence. FED. R.CRIM.P. 12.2(c)(2). The government is then entitled to make use of its experts' results and reports only in rebuttal to mental condition evidence put on by the defendant. FED.R.CRIM.P. 12.2(c)(4). In short, the government's taint attorneys and the government's experts have a reasonable need for the "raw testing data" obtained by the defendant's experts to lay the groundwork for a rebuttal to the defendant's mental condition without unnecessary delay of the trial, but the defendant has no such reciprocal need for the "raw testing data" obtained by the government's experts before she actually puts her mental condition at issue in the "penalty phase."

Therefore, Johnson is not entitled to reciprocal access at this time to the "raw testing data" obtained by the government's experts. Instead, she will be entitled to such access only if she is convicted and confirms her intent to offer during sentencing proceedings expert evidence on mental condition. FED.R.CRIM.P. 12.2(c)(2).

### III.   CONCLUSION

The court concludes that notice of a defendant's intent to rely on a mental condition mitigating factor does not necessarily provide a comprehensive waiver of the defendant's right against self-incrimination, such that the government's experts are entitled to ask, and the defendant must answer, questions about the defendant's thinking or conduct at the time of the charged offenses. Rather, in the circumstances of this case, the court finds that Johnson has made an initial showing that neither "need" nor "fairness" requires inquiry by the government's experts into such matters. Therefore, Johnson will *not* be compelled to answer questions concerning her involvement in the crimes at issue here during the examinations by the government's mental health experts. However, based on her representations to the court and the taint attorneys, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the "penalty phase," if any, of these proceedings. This conclusion does not preclude the government from reasserting the issue of the need for offense-specific questioning after the Rule 12.2(c)(2) and (3) disclosures or at such other time as the government can demonstrate that offense-

specific questions are necessary to the proper evaluation of any mental condition mitigating factor that Johnson actually asserts in these proceedings. Finally, the government's taint attorneys and the government's experts are entitled to access at this time to the "raw testing data" already obtained by the defendant's experts and to prompt access to any "raw testing data" that the defendant's experts may obtain in the future without further order compelling such access.

The Clerk of Court shall provide copies of this order to defense counsel and the government's outside taint attorneys, but shall *not* provide a copy of this order at this time to the prosecuting attorneys.

**IT IS SO ORDERED.**